## JACOBSEN et al. v. LEWIS KLONDIKE EXPEDITION CO.

(Circuit Court of Appeals, Ninth Circuit. October 7, 1901.)

### No. 670.

1. ADMIRALTY—APPEAL—REVIEW OF FINDINGS OF FACT.

It is a well-established rule in admiralty that where the objection on appeal to a decision is that it is based on a fact found by the lower court on conflicting testimony, or on the testimony of witnesses whose credibility is questioned, such decision will not be reversed unless it clearly appears to be against the evidence.

2. TOWAGE—BREACH OF CONTRACT BY TOWING VESSEL—NEGLIGENT NAVIGATION.

A steamship engaged in transporting passengers and freight from Seattle to Alaskan ports also contracted to tow two steamers designed for navigating the Yukon river to St. Michaels. She attempted to take the outside course, but was compelled to return because of injury to the tows, and then proceeded on the inside passage for 700 miles, when she again took the outside course, against the protest of the tows, and continued until obliged by a distress signal from one of the tows to take her into a port for repairs. The passengers objected to the delay occasioned by the tows, and she then left the disabled tow and proceeded by the open sea with the other, which was lost two days later. The one which was left subsequently made St. Michaels, taking the inside passage, under her own steam. It was shown that the only safe course with such tows, and the one usually taken, was by way of the inside passage. *Held*, that the fact that the towing steamer was also engaged in other business did not relieve her from the obligation under her contract to exercise the same degree of care and skill with regard to her tows as would have been required under the circumstances if the towage had been the only purpose of her voyage, and that a finding that she was negligent, and failed to exercise such care and skill, in leaving the inside passage and in abandoning her tow, and was liable to such tow for a breach of contract, was supported by the facts shown.

3. ADMIRALTY—COSTS—EXPENSE OF PROCURING BOND.

The claimant of a libeled vessel secured an order, under admiralty rule 53, requiring the libelant to give security to respond in damages, as claimed in respondent's cross libel. In compliance with such order, libel-

ant procured a bond to be executed by a surety company. *Held* that, on dismissal of the cross libel on final hearing, respondent was properly taxed with the amount paid by libelant for such bond, as a part of the costs.

Appeal from the District Court of the United States for the Northern Division of the Northern District of Washington.

This is an action brought by the Lewis Klondike Expedition Company against the steamship Noyo, her tackle, apparel, and furniture, to recover damages for breach of contract in failing to tow the steamer W. H. Evans, a light-draught Yukon river boat, from Seattle, Wash., to St. Michaels, Alaska. The lower court rendered a decree in' favor of the appellee for $4,250 and costs, and the appellant now seeks a reversal of this decree.

The contract involved in this action provided for the towing by the steamer Noyo of the river steamboat W. H. Evans from Seattle to St. Michaels, for the sum of $4,500, of which $2,000 was to be paid in cash upon the signing of the contract, and the remaining $2,500 in transportation of freight and passengers at certain specified rates from St. Michaels to Dawson City, or any other point on the Yukon river. It was also agreed that the steamer W. H. Evans should carry to St. Michaels 50 tons of coal or freight, at the option of the appellant, free of charge for freight and carriage. It was further provided that the steamer W. H. Evans should furnish her own towline or hawser, and all other things necessary and proper in the towage of said steamer, of sufficient strength and durability, at the absolute risk of the owners of the steamer Evans, and that the steamer Noyo should not be liable for any damage or loss to the steamer Evans by virtue of the parting of the towlines or hawsers used for towing the steamer from Seattle to St. Michaels, or any other unavoidable cause, "provided, always, that said steamer Noyo shall use reasonable care, skill, and diligence in towing said steamer W. H. Evans between the port of Seattle and the port of St. Michaels, as aforesaid." In this connection it was further provided that the steamer Noyo should not be liable for any damage or loss resulting to the steamer Evans from any delay occasioned by stress of weather, accident, perils of the sea, or misadventure, during said voyage. It was also agreed that the steamer Noyo should have the right to take in tow another river steamer for the same voyage. As security and indemnity to the owners of the Noyo for the unpaid balance of towage charge, it was agreed that the steamer Evans should be insured in the sum of $2,500 in favor of the appellant Jacobsen, agent of said steamer Noyo. It appears that the payment of $2,000 in cash was made, and the steamer Evans duly prepared for the voyage; having on board the 50 tons of coal mentioned in the contract, other freight, and a number of passengers. On June 21, 1898, the steamer Noyo left Seattle, having in tow the Evans and another river steamboat,—the Alfred J. Beach. On the following day an attempt was made to tow the vessels out by Cape Flattery to the open sea, but, owing to difficulty with the towing apparatus, a return to Port Angeles was made, in order that the necessary repairs might be made. A change of masters of the steamer Noyo was here made, and on June 25, 1898, the new master proceeded to tow the vessels by the so-called "inside route" until they reached Dixon's Entrance on July 1, 1898, when another attempt was made to go out into the open sea; that being the more direct route to St. Michaels. Very shortly thereafter, and on the same day, the steamer Evans, having parted one of her hog chains, signaled her desire to be towed into harbor. It is alleged that after communication between the vessels the Noyo continued to tow the river boats out to sea for nearly four hours, disregarding the request of the master of the Evans until the national signals of distress were displayed by the Evans, when the Noyo returned to anchorage with the river boats in American Bay, at Howcan Island; that, after the Noyo had turned back with her tow in response to the signals from the Evans, 29 passengers on board the Noyo signed a formal written document prepared by one of their number and addressed to the master, in which they protested against the delay in the voyage caused by the towing

of the two river boats Evans and Beach, representing that the passengers had valuable supplies aboard, destined to camps in the interior of Alaska, which were to supply men with food during the winter, and represented further that in a short time it would be too late to get the supplies up the Yukon to destination, and that delay of the Noyo would mean almost criminal negligence to the passengers. They accordingly protested against any further delay by the Evans, or that the vessel be taken further than Howcan, but that the Noyo proceed at once without delay by the direct route to St. Michaels. The Noyo thereupon left the Evans at American Bay, and a few hours later proceeded out to sea with the steamer Beach in tow. It appears that within three days the steamer Beach sank, and the Noyo proceeded alone on to St. Michaels, arriving there on July 16th; that after some necessary preparation the Evans proceeded from American Bay under her own steam to St. Michaels, following the inside route through Clarence, Stikene, and Sumner Straits, Wrangell Narrows, Frederick Sound, Chatham Straits, and Cross Sound, to the open sea; thence by the coast line to Isanotski Strait, between the Alaska Peninsula and Unimak Island; and thence by the north and west shore of Alaska to St. Michaels, arriving there on August 30th. The towage of the Evans from Seattle to American Bay covered a distance of about 700 miles. The voyage of the Evans under her own steam from American Bay to St. Michaels covered a distance of about 2,100 miles. The libel charges collusion of the officers of the steamer Noyo with the officers and owners of the steamboat Beach to wreck the steamer Evans, in order to lighten the load of the Noyo and hasten her arrival at St. Michaels, and that in pursuance of this conspiracy the attempts to take the open ocean route were made; that such action was in violation of the contract of towage to use reasonable care, skill, and diligence in towing said steamer Evans, as prudent seamanship required the following of the inside route, where safe anchorage could easily be obtained in stormy weather. By reason of this alleged breach of contract, and consequent delay in the arrival of the steamer Evans at St. Michaels, the libelant claims to have suffered damages as follows: Cash payment on towing contract, $2,000; injury to vessel, $2,500; extra expense in navigation, $3,500; and loss of business and profits on Yukon river, $16,000; total, $24,000. The respondent, in its answer, denies the conspiracy, imprudent seamanship, and willful disregard of life and property and contractual obligation charged, and alleges that all the damage suffered by the steamer Evans was because of her unseaworthiness, improper stowage of cargo, and the conduct of her master in refusing to proceed under tow of the Noyo. For a cross libel the respondent alleges damages as follows, suffered by it by reason of the nonfulfillment of contract on the part of the libelant: 50 tons of coal, at $12, laden on the Evans, and belonging to the Noyo, $600; balance of towage contract, $2,500; expenses occasioned by putting back to port of Port Angeles to repair towing lines of steamer Evans, $1,500; expenses in returning passengers and freight from St. Michaels to Seattle, contracted to be carried by the Evans up the Yukon river, $1,200; loss of profits on 150 tons of freight contracted to be carried by the Evans up the Yukon for the Noyo, $4,500; total, $10,300.

The testimony varies somewhat as to the circumstances of the parting company of the Noyo and the Evans; the witnesses for the appellant stating that the master of the Evans refused to go further under the tow of the Noyo, while the master of the Evans, in his deposition, says that the master of the Noyo notified him that he would not tow the Evans any farther, when at Howcan Island, and demanded the 50 tons of coal that were on board the Evans, but that, as no fuel could be obtained there, he kept it for use on the Evans. Exhibits were introduced of written communications which passed between the two masters when going out to sea through Dixon's Entrance, as follows:

"At Sea, July 1, 1898.

"To Capt. of Str. Noyo: I want you to take the Str. W. H. Evans into harbor, as you are wrecking her all to pieces, holding her head to the sea. I will hold you responsible both as a steamboat man and criminally, as it looks as though you are trying to destroy the boat, when you send me word

that if I don't sign a release you will tow her until she sinks. You take all responsibility upon your own shoulders.

"C. H. Lewis, Master of Str. W. H. Evans."

In response the following was received:

"Capt. Lewis, Str. W. H. Evans—Dear Sir: At your request I will take your steamer to a port of anchorage. Kindly sign inclosed request, and oblige,

"Yours truly,                    W. H. Edgett, Master of Str. Noyo."

The inclosure read as follows:

"At Sea, July 1, 1898.

"I, as master of steamer W. H. Evans, in tow by Str. Noyo, Seattle to St. Michaels, do hereby agree to release the steamer Noyo, her owners or charterers, from any further agreement according to contract dated at Seattle, Wash., June 9, 1898. I hereby request to be taken to port of anchorage."

Capt. Lewis did not sign this release, and the Noyo continued to tow the Evans out to sea until the extreme distress signal was displayed, when a return to anchorage was made, and the separation occurred.

Upon the proofs returned, the lower court fixed the liability for breach of contract upon the appellant; that the attempt to proceed out to sea with the two vessels in tow, under the existing circumstances, was such a fault on the part of the Noyo as to amount to failure to perform the contract in good faith, and render the vessel and its owners responsible in damages. The court found the evidence insufficient to afford a basis for an accurate estimate of the amount of damages which the libelant was entitled to recover, but allowed the amount of the advance payment on the towing contract ................................................................. $2,000

Additional expense to the Evans incurred in getting to St. Michaels, $100 a day for 30 days.............................   3,000

Loss of business on stipulated transportation up the Yukon river for the Noyo.................................................   2,500
                                                                    _____
                                                                    $7,500

And to the respondent, as a set-off, was allowed:
The coal kept and used by the Evans, 50 tons, at $15...... $ 750
Balance of towage money if contract had been performed.. 2,500  3,250
                                                                    _____

Leaving a balance for the libelant of.....................  $4,250

Ballinger, Ronald & Battle and Burke, Shepherd & McGilvra, for appellants.

Charles E. Shepard and James Kiefer, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The assignments of error relate to the finding of the court that the appellant did not exercise due care and skill in the towing of the steamer Evans, and was therefore guilty of a breach of the contract of towage; to the measure of damages awarded; to the non-apportionment of damages between the parties, because of the alleged contributory negligence of the appellee; to the admission of the deposition of the master of the Evans, it not being properly authenticated or verified, and incompetent because of the death of the master of the steamer Noyo; and to the taxing as an item of costs the sum of $71, "premium paid for bond on alleged claim in cross libel." In determining whether the lower court should be sustained in its findings of fact, it is necessary to ascertain which

party was guilty of a breach of the contract of towage. By the terms of the contract the steamer Noyo was required to tow the steamer W. H. Evans from the port of Seattle, Wash., to St. Michaels, Alaska. This part of the contract was never performed. It was further provided that the steamer Noyo was not to be liable for any damage or loss to the steamer Evans by virtue of the parting of the towlines, or any other unavoidable cause, provided that said appellant vessel should use reasonable care, skill, and diligence in towing said steamer Evans. It is well-settled law that the towing vessel is bound to exercise reasonable care and skill in the performance of the duty assumed, and that failure therein will create liability for any injury resulting. The Webb, 14 Wall. 406, 414, 20 L. Ed. 774; The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Burlington, 137 U. S. 386, 392, 11 Sup. Ct. 138, 34 L. Ed. 731. Did the Noyo in this case fail to perform such duty? A somewhat different state of facts is presented than in the usual controversy for breach of a towage contract. Ordinarily the sole purpose of the towing vessel is to take her tow safely and expeditiously to the point of destination. But in this case there was an added purpose. In fact, it is perhaps questionable whether the towing of the vessels was not deemed of secondary importance to the main business of transporting passengers and freight as quickly as possible to the port of discharge. The steamer Noyo was not a tug, whose sole business was that of towing. It was a steam schooner, about 100 feet in length, engaged in the transportation of freight and passengers between Seattle, Wash., and St. Michaels, Alaska. At that time the great rush to the Klondike was under way, and vessels of every description were pressed into service for all Alaskan points, the supply being wholly inadequate. River boats were in great demand on the Yukon, and all possible means taken to get such boats to the entrance to the river at St. Michaels. The Noyo, under this stress of circumstances, undertook to tow for more than 2,800 miles two boats aggregating three times her own length, loaded with coal and Alaskan supplies, in addition to carrying the load in her own hold. Part of this voyage was necessarily by way of the open sea. Such an undertaking called not only for great power on the part of the towing vessel, but enlarged the measure of her duty to cover the increased risk of disaster, and to meet the conflicting interests of her various contractual engagements, namely, the two contracts of towage, and the agreements with respect to her own passengers and cargo. The "reasonable care and skill" required by law in the performance of the towage contract was not diminished or waived by the added undertakings. It was incumbent upon the Noyo to perform all the conditions of her contract with the Evans with the same degree of care and skill as would have been required of her had the towage contract been the only purpose and object of the voyage. The court below finds that the first attempt of the steamer Noyo to tow the vessels by way of Cape Flattery out into the open Pacific Ocean was clearly and beyond question extremely imprudent, and that the second at-

tempt by way of Dixon's Entrance, with the Evans in a disabled condition, was reckless navigation. The court finds further that the master of the Noyo did not exercise that degree of care, skill, and patience necessary under the circumstances, which required him to regulate the speed of his ship so as not to strain the vessels in tow, and to wait when necessary for repairs, as well as to avoid dangerous storms; that although the master was environed by hard circumstances, such circumstances did not constitute an avoidance of legal liability for failure to perform the contract entered into; that although the master of the Evans consented to start on the voyage with his steamer pulling the second tow, he did not consent to the wrecking of his steamer thereby, and when he found that she would not stand the strain he did right in calling a halt; that the fact that the Evans got through to St. Michaels by the use of her own power after being left by the appellant vessel proved that she was a strong, well-built vessel; that other steamers of the same class were taken from Seattle to St. Michaels during the same season in tow of seagoing vessels, and there does not appear to be any reason why the Evans should not have been towed safely, if taken by the safest route, and if the necessary care and patience had been exercised on the part of the master of the towing vessel. The rule has been well established in cases in admiralty in this court, and, as we believe, in the supreme court of the United States, that where the objection to a decision is that it is based upon a fact found by the lower court upon conflicting testimony, or upon the testimony of witnesses whose credibility is questioned, the decision of the lower court will not be reversed unless it clearly appears that the decision is against the evidence. The Alijandro, 6 C. C. A. 54, 56 Fed. 621, 624; The E. Luckenbach, 35 C. C. A. 628, 93 Fed. 841, 842; The Anaces, 45 C. C. A. 596, 106 Fed. 742, 743; Elphicke v. White Line Towing Co., 46 C. C. A. 56, 106 Fed. 945, 946; Whitney v. Olsen, 47 C. C. A. 331, 108 Fed. 292, 296; Davis v. Schwartz, 155 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289; Compania de Navigacion la Flecna v. Brauer, 168 U. S. 104, 123, 18 Sup. Ct. 12, 42 L. Ed. 398; Stuart v. Hayden, 169 U. S. 1, 18 Sup. Ct. 1, 42 L. Ed. 639; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181. It does not appear necessary, however, to resort to this rule to support the findings of the district court in this case. The preponderance of testimony and the inferences to be drawn from established facts clearly support the findings. There was manifest lack of care and skill on the part of the master of the Noyo in his effort to tow the Evans to sea through Dixon's Entrance, in the then disabled condition of the latter vessel; and the demand of the master of the Evans to be towed into a safe harbor for repairs was, under the circumstances, reasonable and proper. The fact that the master of the Noyo then abandoned the Evans in American Bay is supported by the testimony of witnesses and the inferences to be drawn from surrounding circumstances,—among others, the protest of the passengers to the master of the Noyo against the delay caused by the towage

of the Evans, and their demand that the Noyo should proceed without delay, and by the direct route, to St. Michaels. This protest and demand undoubtedly had its effect upon the master of the Noyo, and accounts for his conduct in proceeding to sea without the Evans, instead of taking the inside passage, by way of Cross Sound and the coast line, with the Evans in tow.

The appellant contends, however, that the master of the Evans unqualifiedly refused to allow the Evans to be towed further under the contract, after arriving at anchor in American Bay, and by so doing broke the contract, and released the towing vessel therefrom. The testimony shows that the master of the Evans expressed a willingness to proceed under tow if taken by the inside route, but that, rather than be towed further in the reckless manner pursued up to that time, he would go on alone under his own steam. The circumstances do not warrant the conclusion that this statement was made for the purpose of breaking the contract, merely. It was of the greatest importance that the Evans should arrive at St. Michaels promptly, for the fulfillment of its engagements there, and that it might make a trip up the Yukon that season. Much delay meant the loss of all business for it that season. It must be considered, then, that the master of the Evans was sincere in his belief that to go on over the route insisted upon by the master of the Noyo meant the destruction of his vessel, and perhaps loss of life, and that his refusal to go on under tow was merely a refusal to go over that route.

The appellant also contends that, in the absence of special agreement, the choice of route was a matter resting in the sound judgment of the master of the towing vessel, and that the Noyo was only required to convey the tow to destination by the most direct customary route. Conceding this, and granting the correctness of the decisions cited in support thereof, it does not appear in this case that the master of the steamer Noyo exercised sound judgment in the choice of route. It is not borne out by the evidence with regard to the attempts that were made to go out into the open sea with the two tows, nor the result of the final venture with but the one vessel in tow; it appearing that the remaining vessel, the Alfred J. Beach, towed by the Noyo, was lost on the second day after proceeding to sea without the Evans, not being able to withstand the strain of the towing against a head sea. The majority of vessels with tows proceeded by the inside route, where shelter was easily afforded during the greater part of the voyage, while wreckage and disaster seem to have followed those that attempted the open sea route. "Reasonable care and skill" depends for its interpretation upon the peculiar circumstances of the case in question. In the towing of a boat built only for the shallow water of an inland stream, greater care must necessarily be used when venturing upon an ocean voyage than with a vessel fitted for the deep water, not only in the choice of route, to select the one affording the smoothest water and convenient shelter in stormy weather, but in the handling of the tow. This quality of care and skill does not

appear to have been given by the steamer Noyo, and its absence constitutes a breach of the contract in question, fixing liability therefor upon the owners of such vessel.

Exception is taken to the apportionment of damages by the lower court, and the contention is urged that, even if the Noyo shall be found guilty of negligence, the Evans must be found to have been at fault as well, in which event, in accordance with admiralty practice, the damages should be equally apportioned. The Evans has not been found to have been at fault, and this rule is therefore not applicable. The court below allowed to the libelant—

The advance payment made on account of the towing contract, which service was unperformed............................................... $2,000
Additional expenses to the Evans caused by the breach of contract and delay, $100 a day for 30 days.......................................... 3,000
Loss of business on stipulated transportation up the Yukon river for the Noyo .................................................................... 2,500

                                                $7,500

With offsets to the respondent below as follows:

Coal kept and used by the Evans, 50 tons, at $15.............. $ 750
Balance of towage money if contract had been performed.... 2,500   3,250

       Balance in favor of the libelant.................................... $4,250

An entirely accurate estimate of damages seems impossible to be made from the evidence introduced, but the foregoing is undoubtedly just, and should be upheld.

As to the exception with regard to the admission of the deposition of Capt. Charles H. Lewis, the master of the Evans, the objection that the deposition was not properly authenticated or verified appears to be covered by the stipulation of the parties, providing that the document purporting to be the deposition of Charles H. Lewis should be treated as if the same had been signed and sworn to by the said deponent, and had been attested and returned by a competent officer under the stipulation for taking said deposition. The other objections to this deposition are equally untenable.

We are also of the opinion that the exception to the item of $71 for costs incurred in the premium paid for bond should not be sustained. The claimant of the libeled vessel secured an order from the district court requiring the libelant to give security to the claimant in the sum of $5,000 to respond in damages as claimed in respondent's cross libel. The order was made in accordance with admiralty rule 53, and the libelant furnished the American Bonding & Trust Company of Baltimore City as surety on the indemnity bond. The cost for this security was $71, as charged in the cost bill and allowed by the district judge. Expenses incurred under a lawful order of the court may be taxed as part of the judgment against the losing party. Neff v. Pennoyer, 3 Sawy. 336, Fed. Cas. No. 10,083; Simpson v. One Hundred and Ten Sticks of Hewn Timber (D. C.) 7 Fed. 243, 246; Dennis v. Eddy, 12 Blatchf. 195, Fed. Cas. No. 3,793.

The decree of the district court is affirmed.