## THE EUROPE.

(District Court, D. Oregon. December 6, 1909.)

### No. 4,986.

1. COLLISION (§ 69*)—VESSEL ANCHORED IN FAIRWAY—MEASURE OF CARE REQUIRED.

The rule as respects a vessel at anchor in a fairway is that she must take precautions commensurate with the danger she presents to shipping.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 89; Dec. Dig. § 69.*]

2. COLLISION (§ 73*)—VESSEL AT ANCHOR AND MOVING VESSEL—PRESUMPTION AS TO FAULT.

The rule that a moving vessel must keep out of the way of one at anchor is applied with great strictness where the anchored vessel is in a proper place, and the presumption of fault for a collision in such case is against the moving vessel, but such presumption does not obtain where the anchored vessel was where she should not have been. In either case, however, the moving vessel must avoid her if it be reasonably practicable and consistent with her own safety.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 103; Dec. Dig. § 73.*]

3. COLLISION (§ 122*) — RULES TO PREVENT COLLISION — NECESSITY OF STRICT OBSERVANCE—PRESUMPTION.

A statutory rule adopted and designed to prevent collision should be scrupulously observed, and a vessel in collision is presumed to be in fault if at the time she was actually violating such a rule, and can only escape liability by showing that her violation could not have been the cause of the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 257; Dec. Dig. § 122.*]

─────────────

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. COLLISION (§ 75*)—RULE RESPECTING LIGHTS ON ANCHORED VESSEL—HEIGHT —"HULL OF VESSEL."

Under article 11 of the Inland Navigation Rules (Act Aug. 19, 1890, c. 802, 26 Stat. 324 [U. S. Comp. St. 1901, p. 2867]), providing that a vessel of 150 feet or upward in length, when at anchor, shall carry a white light forward not less than 20 feet above the hull, where a vessel has a forecastle reaching far back on her deck and a poop extending far forward, they are to be deemed a part of her hull.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 113; Dec. Dig. § 75.*]

5. COLLISION (§ 71*)—MOVING AND ANCHORED VESSEL—FAULT OF MOVING VESSEL.

A collision occurred at night in the Willamette river between the French bark Europe, anchored in the fairway and the steamer Annie Comings going down the river with a strong current. The Europe was a seagoing vessel, 303 feet long, laden ready for her voyage, and could not well have anchored outside of the channel. She carried lights of proper size, so placed, and without substantial obstruction, that they could have been seen for a distance of 2 miles, but the forward light lacked 2½ feet of being 20 feet above the deck as required by article 11 of the Inland Navigation Rules (Act Aug. 19, 1890, c. 802, 26 Stat. 324 [U. S. Comp. St. 1901, p. 2867]), while the after light was not 15 feet lower than the forward one as required by such rule. She also had a watchman, but he was at the time on the main deck back of the forecastle, where he could not see a vessel approaching from ahead. The pilot of the Comings was at the wheel and a lookout on deck, but neither saw the lights of the Europe until within 300 feet, when it was too late to avoid collision. Held, that the Europe was not anchored in an improper place, there being no designated anchorage grounds; that neither the position of the watchman nor the improper position of the lights could have contributed to the collision, the only fault charged with respect to the lights being that they were obscured and could not be seen from in front; but that the fault for the collision was solely that of the Comings, whose navigators were grossly negligent in not seeing or heeding the lights of the Europe and avoiding her, as there was ample room to do.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

6. COLLISION (§ 129*) — DAMAGES RECOVERABLE — EXPENSE OF BOND FOR RELEASE.

A vessel libeled for collision, but adjudged free from fault, is entitled to recover as a part of her damages a reasonable sum for her expenditures in securing a bond for her release.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 283; Dec. Dig. § 129.*]

In Admiralty. Suit by the Western Transportation & Towing Company, as owner of the steamer Annie Comings, against the French bark Europe. Decree for respondent.

The Annie Comings, while proceeding down the Willamette river on the evening of December 30, 1907, collided with the French bark Europe, anchored in the stream, which resulted in the sinking of the Comings and damage to the Europe. Libel has been instituted and cross-libel filed to determine the fault and relative liability ensuing from the collision. The Europe is a ship 303 feet in length, and was loaded with 3,562 tons of wheat. Being ready for sea, she was towed to her place in the river and brought to anchor, under the directions of Capt. Pope, a competent pilot. It is alleged that the Europe was anchored in the fairway, and directly in the course of vessels plying the river. This is set down as a fault against the ship. But the especial complaint is made that she was so anchored without proper riding lights, as required by law, so disposed and situated as to give notice and warning of her position and

presence in the stream, and without a proper anchor watch on duty before and at the time of the collision. As to the lights, it is specifically alleged that at no time did the Europe exhibit a large white light, visible around the horizon, situated in the proper place, or at the proper distance above the deck, to give suitable warning to boats plying to and fro upon the river. The cross-libel, denying these averments, alleges that the Europe was lying outside of the fairway, and was equipped with the proper riding lights, disposed as follows: Bright white lights were hung at the bow and stern, which were visible for a distance of more than 2 miles; the light at the bow being placed upon one of the stays 25 feet above the deck, and that at the stern upon the spanker boom at a height of 17 feet above the deck, both unobscured. As showing the fault of the Annie Comings, it is further alleged that, while descending the river, she was so carelessly navigated, by an attempt to cross the bow of the Europe in such close proximity, with the current then running in the river, as to foul the Europe's bowsprit, causing the hogchains of the Comings to part, by reason whereof she broke in two and sank, at the same time rendering damage to the Europe. Such are the issues presented by the pleadings.

Cake & Cake, for libelant.
Williams, Wood & Linthicum, for claimant.

WOLVERTON, District Judge (after stating the facts as above). It is not possible from the evidence to locate the Europe exactly as she was anchored at the time of the collision. Her position was more than a mile above Linnton. Capt. Rollier, who was master of the Europe, thinks she was a mile and a half away. Another point of location by which her position was fixed is a turpentine factory on the Linnton side, which is more than a mile about Linnton. Witnesses place her from 150 to 300 feet below this factory. By the course of the river, this ascertainment of the ship's position is near enough for practical purposes. Regarding her position in stream, the witnesses vary widely. The ship's channel at the point is conceded to be about 500 feet in width. James McCullough, who shipped two sailors on the Europe, and who was aboard at the time of the collision, fixes the distance from the west shore at from 300 to 400 feet; Capt. Rollier at about 230 feet; and Chap de Laine, one of his crew, at 240 to 260 feet. Capt. J. J. Anderson, navigating the Hassalo, passed the Europe up stream about 3:25 in the afternoon, and he says she was at anchor at that time on the east side of the ship's channel, about abreast of the turpentine factory. He does not attempt to fix the distance from the west shore or that margin of the channel. He passed down again about 9 o'clock, and at that time the ship was lying somewhat above Linnton. Capt. Spinner, who was pilot and navigating the Annie Comings at the time, places the Europe 300 feet from the west edge of the channel. Later he says she was from 340 to 400 feet from the edge of the water. The water at that time, being high, extended from 40 to 100 feet, perhaps farther, beyond the channel; the channel at low water virtually extending to the bank. Henry McGraw, who located the machinery that sank from the Comings, places the position of the Europe about 400 feet from the west shore. The boiler of the Comings was found the next morning after the collision about a quarter of a mile below where the machinery was found, at the stern of the Europe, and within from 150 to 200 feet of the west bank. The ship, without

doubt, dragged her anchor after the collision, the two boats going down stream together for a distance of something like a quarter of a mile. The Comings had on her deck in front of the pilot house some heavy machinery. Being broken in two by the collision, she in all probability dropped the machinery near the place of collision. The fact that the Comings' boiler was found the next morning at the stern of the Europe, and about a quarter of a mile below the machinery, indicates that the Europe shifted her position by that distance down stream. W. L. Beyer, who located the machinery some two weeks after the collision, places it on the east side of the channel, and about 450 feet from the east shore. He thinks the river was then 1,200 feet or more in width, and that the machinery was some 700 feet or more from the west shore. A. H. Morrill, manager of the libelant company, who was frequently at the places both where the machinery and the boiler were found and raised, fixes the location of the machinery at about 500 feet from the west bank, and the boiler at from 250 to 300 feet therefrom. He says, however, that the machinery was situated some 1,000 feet from the east bank of the river. It is a fact not disputed that the river was high at the time, and the current strong, moving at the rate of five or six miles an hour. There was hence a large expanse of water upon either side of the Europe, if located any place in the ship's channel, and to the east of her the width was nearly 1,000 feet, if not more. River boats, such as the Annie Comings, could at the time navigate any part of this expanse, either to the east or to the west of the Europe, with safety.

From the above testimony, I conclude that the Europe was anchored somewhat beyond the middle of the ship's channel looking from the west. There is much confusion among the witnesses in passing their judgment, some estimating from the shore or bank, and others from the margin of the ship's channel. From an inspection of the government's chart, it appears that the ship's channel does not extend to the margin of the stream by some distance; and when the river is high the distance would be increased. So when the witnesses fix the location of the Europe at from 300 to 450 feet from the west shore or bank, it becomes quite probable that she was not very much farther east than the center of the channel. Even then, it is evident that she must have been west of the thread of the current. The drift of the vessel indicates that, as she was carried over to the west bank. Whereas, if she had been lying to the east of the thread, she would in all probability have been carried towards the east rather than the west. It is not possible, it would seem, that she was driven directly across a strong current, to find a lodgment upon the opposite side, her drift being about a quarter of a mile or slightly above. True, the current at the point of the ship's anchorage runs in near the Linnton side; but this is a circumstance showing that the vessel could not have been far out into the stream. It is probable, therefore, that the Europe's position was from 300 to 400 feet from the west bank, which would put her out into the ship's channel or fairway from 260 to 350, possibly, 400, feet.

It may now be ascertained what were the nature and position of the riding lights displayed upon the Europe at the time of the colli-

sion. Her forward light was exhibited in court and measured. It consisted of a corrugated glass lamp, 10⅞ inches in diameter, and 8¾ inches in height. This was a white light made fast to the foremast stay. Capt. Rollier testifies that its position was 25 feet above the deck, and that it could be seen at a distance of from 2 to 2½ miles, and, further, that the light aft was about 5 inches in diameter, and attached to the spanker boom 17 feet above the deck. Capt. Spinner describes the position of the forward light as being hung under the forestay leading from the foretopmast to the knighthead; the forestay consisting of two wires bound together, and bound about with chafing gear to protect the foresail, which comes in contact with the forestay when running free. The chafing gear extended "down even with the center of the light," and the position of the lamp was from 14 to 18 inches back of the stay. Thus constructed and bound about with the chafing gear, witness affirms that the forestay presented a surface of 9 inches in front of the light. Having boarded the Europe after the collision, witness saw the light, and says:

"It was supposed to be a bright light, but it wasn't burning very brightly. It wouldn't, I don't think, comply with the law which calls for a bright light to be visible at any time a mile away. I don't think it would have been possible, had the light been out in the clear, to have been observed a mile away."

When the collision occurred the crew and passengers of the Comings were taken aboard the Europe.

Henry McGraw, who was mate on the Comings, testified that he examined the forward light; that it was hanging to the lower forestay, and that the chafing gear extended about three feet below the light, presenting a surface of about nine inches in front thereof. He further says the light was of corrugated glass construction, and was very dim. He thought that the aft light was brighter than the front light, and that if a person was approaching the ship directly from the front the stay would obscure the light.

F. A. Copeland, who was captain of the Annie Comings, and aboard of her at the time, testifies that when he reached the deck of the Europe he looked to see if the forward light was burning; that it appeared to be burning, but not very bright; that he noticed the forestay could be an obstruction to the light to a boat coming head down the river, and might obscure it so it could not be seen; that the chafing gear came down to the bottom of the lamp, and that the stay, thus incumbered with the chafing gear, presented an obstacle of about eight inches in diameter in front of the light; that he attempted to make a memorandum of the name of the captain of the Europe, and the light was so dim that he could not see well enough to do it.

Capt. Albert Crowe went aboard the Europe the next morning, and made measurement of the height of the anchor light above the forecastle deck, which he found to be 17 feet 6 inches to the center of the light. The forecastle deck of this ship is about 100 feet in length, and extends back of the foremast. Capt. Crowe also states the distance from the forecastle deck to the water line to be about 37 feet. Further, he testifies that he went up into the rigging until his eye was on a level with the lamp, and found that the farther end of the jib

boom was near on the same level; also that three or four headsails were furled upon the jib boom, which gave it a breadth of some 2½ feet; that that would be its breadth or thickness at the extreme end; that from the front it would obscure the light altogether; and that a pilot standing at a position lower than the point of the jib boom, approaching the vessel head on, could not see the light. He says, further, that the light on the forestay, if it had been high enough, would have been in the usual place for it, and that the end of the jib boom was about 65 feet distant from the light. The witness closed his testimony as follows:

"Q. This light was in a globe, was it? A. Yes, sir. Q. Could you see it from behind as well as in front of the ship, or either side? A. You could see it on either side, from all around the horizon, except if you came in line of one of the masts. Q. Well, now, what was the size of the globe? A. The light that was shown at the investigation at the Custom House I think was a 12-inch diameter glass; but, of course, I am not sure whether that was the one that was up on that particular night, or not. Q. Of course, the flame of the light itself is not very much? A. The regulation is an inch and a quarter wick for a lamp to hang on that size ship. Q. Was this the regulation lamp—inch and a quarter? A. The lamp shown at the investigation by the U. S. Inspectors exceeded the requirements, I think, about four inches in diameter in excess of the requirements. It was a very fine lamp. Q. Well, now then, in looking at a lamp of that kind, in a globe 12 inches in diameter, does it show a 12-inch light? A. Yes, sir. It is so constructed—special construction according to law —that it is a perfect light for the whole diameter of that glass."

McCullough says the lights seemed to be burning all right, but that he did not take special notice of them.

Capt. Rollier, and other officers and members of his crew—seven in number, and among them the officers who put up the lights previously in the evening—all testify that the lights of the Europe were burning brightly at the time of the collision, and were unobstructed. Measurements were made by some of them for ascertaining the height of the forward light above the deck, and they fixed it at 25 feet. That is the main deck. The forecastle deck is perhaps 7½ feet higher than the main deck. None of these witnesses were questioned specifically touching the forestay and jib boom as to whether they or either of them obscured the light from the front, except Capt. Rollier, who says the forestay—the two wires bound together—was only about four inches in thickness.

So much for the lights and their position aboard ship.

Capt. Spinner relates the circumstances of the collision as follows:

"A. Well, we left Albina dock. I was in charge—that is in charge of the pilot house—the captain was aboard. And going down everything went well until we got down just below St. Johns. It was quite dark, there was a heavy current, and quite a little drift running. In a case like that we keep close watch so as not to run over drift, and break rudders or anything. * * * I should judge it was about from five to six miles current in the river. In going down, in looking for the drift, I saw nothing till I saw a white kind of a light shade on the water. As soon as I did, I put my wheel hard over, and the next thing I saw I was right alongside of this jib boom, right straight down on her port side, which would have been on the east side of her jib boom. I put the wheel over, and swung the boat's head clear, but I couldn't swing it back again; and she come around and struck sideways on the jib boom of the ship, like that. We was laying about like that, but swinging. There was no light visible on that ship whatever, from the position that I held in the pilot house,

and the only way that I saw the ship was by the reflection of the electric lights from our lower deck shining on her hull. When I first saw it, I didn't know it was a ship. I knew it was something there, and I put my wheel over. From the time I saw it till the time the boat struck, I should judge it would be about three seconds. Q. Now, Captain, were you coming head on or not? A. Well, I don't know how that would be in court. I suppose 'head on' you would have to be perfect. But it was so near head on that I would'nt like to swear it wasn't head on. We might have been one degree off from head on. Q. (Court:) One point? A. No, one degree. One point is eleven degrees. Q. Were you in the channel after you left St. Johns? Just describe to the court what the direction would be from St. Johns on the east side toward the boat on the west side—what would be the direction of the channel? A. We always run there from St. Johns down to an old dock, that is washed out now, called Watt's dock. Q. Which side is that on? A. That is on the west side. We go down close there. There is a little gradual bend in the river there all the time. In running steamboats and in running compass courses you have to run a direct course. Of course, every pilot and every captain has a little different way of making the courses. I always ran down from St. Johns to what is called 'Watt's Dock'; we straighten up and go towards Linnton Light. That makes two courses from Linnton Light. Q. This ship, in what position was she as to the first course? A. She was directly on the first course. * * * Q. Were you in the channel, the regular course, when you struck this ship? A. Yes, sir. Q. Of boats, steamboats running up and down the river? A. Well, every boat runs a little different course. Now, another captain might come up here, and say he would run more to the westward; another captain might come up and say he would run more to the eastward. Each and every man has a course of his own. Some go to one point and then change, some to another. Q. You were in the regular course of the Annie Comings? A. Yes, sir, the place I always ran, and where I run in a fog. * * * Q. You were not running that day by compass, were you? A. No, sir. Q. Running by the lights on the shore? A. Running by about the lights on the shore, general way; when it is clear that way, so we can see, we never run—very seldom run—by compass, especially on what we call these wildcat boats. * * *

"Q. After you passed the St. Johns Lumber Company's mill, you steered for what? A. I steered for the two back lights at Linnton mill. That is where I run when I took the courses for the boat. Q. When you say the two back lights, what do you mean by that? A. There's two large electric arc lights. The furthest one back is at the Clark & Wilson mill down there. Q. That is the furthest back from the water? A. Yes, sir. Q. Are those government range lights or lights which the mill itself has? A. They are lights which the mill has. Q. When you passed St. Johns, how far did you go from the St. Johns shore? A. Well, we generally run there compass course somewheres along about 200 feet. I might have been a little either one way or the other. Q. Now, the first thing you saw—you state, as I understand, that the first thing you saw—of the Europe was this black shadow on the water, was it? A. No, sir. I said a light shadow. Q. A light shadow? A. Yes, sir. Q. Now, where did that shadow bear with reference to the bow of your boat? A. Directly ahead. Q. Directly ahead? A. Yes, sir. Q. And you did what then? A. I put my wheel hard over—hard aport. Q. And that would swing your bow where? A. To the east side. Q. And did you do anything in the shape of reversing your engines? A. Didn't have time. It wouldn't have done no good. I tried to run clear. You can always run clear of a steamboat in a place like that where you cannot stop and back out. Q. When you threw your wheel hard over, what did your own boat do? A. She swung around and turned the head of the boat away from the ship. It was my intention, if I had had room and time, to have got her head out there and got her wheel over and carried her stern away. I would have tried to get down alongside of that object. As I got closer, I seen it was a ship, at the time I saw it first; when I first commenced to change the course of the boat, I didn't know what it was. Q. Putting your wheel over turned the head of your boat away from the ship and towards the St. Johns shore of the river? A. Yes, in one sense of the word, and another sense it don't. The rudders always swing the stern, not the bow. Of course, approximately, I didn't change the position

of the bow, but I swung the stern around so as to try to run past. Q. Now what side of your vessel collided with the Europe? A. The port side. Q. But your stern had been swinging around? A. Yes. Q. After you put your helm hard over? A. Yes. Q. Now, about what angle was the stern of your vessel with the jib boom of the Europe? A. Probably at that time when she hit about 45 degrees. * * *

"Q. Now, when you saw this light shadow on the water, how far off were you from it? A. Well, I figured about 300 feet. Q. There was a strong current? A. There was a very strong current. Q. And you were running full speed, weren't you? A. Yes, sir. Always run anyways out of the harbor full speed. That is, not as fast as the boat can run—what they call cut-off on; makes an expansion of steam; does not make live steam the whole length of the engine—but average running speed. Q. Your average running speed? A. Yes. Q. How long was it, in seconds or minutes, from the time this light shadow first appeared to you until the time the vessels came together? A. As near as I could figure, about three seconds, from the time that I saw it till I struck. * * *

"Q. Now, Captain, you wouldn't confuse those electric lights, would you, with any light that might have been on the ship? A. Why, no, when a man is on the boat there was nothing to confuse anybody before the accident. Q. That is, you would not confuse the lights, I say, with the lights on the ship? A. No, sir. Q. You are sure you made no mistake of that kind? A. I am sure I made no mistake. Q. And the reason of that is in the difference in the character of the lights, for one thing? A. Well, yes. And then the condition all the way from the bridge—had those lights been visible, as the current sets you over one way or the other, they are bound to change their position a little bit. It would be almost impossible to run a direct line in the river when the current is up. The current will take you one way or the other. And if you happen to see a light ahead of you—that is, on anything in the river, at a fixed point, especially if there is other lights behind you—you are bound to change the character of that light; that is, the position of that light one way or the other. It is impossible to run the boat straight in swift water. Q. Well, now, what lights were you steering by? How many lights were there? A. Well, there was none in particular. I run down on the same line that I took my course. There are two big arc lights on the back of Clark & Wilson's lumber yard, and when I took the course for the boat, I used those lights whenever it was nighttime running down there, to get the direction of the course. Q. You wouldn't confuse those lights with any other lights, would you? A. No, sir. Q. (Cross:) Captain, those were not the only lights on shore, necessarily, were they? A. There were lights all around, both sides of the river. Q. You might have mistaken the lights of the ship for ordinary oil lights on the shore, mightn't you? A. Not likely. Q. Not likely? A. If you would walk down the street where you was acquainted, and you knew every light on the street, you wouldn't confuse one light with another. It is the same way with a man on the river. He not only learns the lights, but everything along the river. When he sees one of those lights he knows what it is. When he sees a strange light, he knows there is something around. If he don't, he has no business to be out on the river. He don't know his business."

A. E. McGraw was the watchman on lookout on the Comings. He says he saw the ship first when the Comings was within 100 feet of her, and that he saw no light on her until after the collision. Some of the witnesses who were present when Capt. Spinner arrived on board of the Europe testify that, when his attention was called to the forward light, he replied, in effect, that he mistook the lights on the ship for the lights on the Linnton sawmill. Spinner denies, however, that he made any such statement or admission.

In the light of this testimony, the respective liability of the parties concerned must be determined.

Capt. Spinner's usual course down stream was to run in near to the shore at St. Johns, and then to head for Watt's dock, which is sit-

uated something over a quarter of a mile above Clark & Wilson's mill, and when in proximity thereto to straighten up for Linnton, thus running on two courses from St. Johns to Linnton. But on this occasion, when off St. Johns about 200 feet, he says he steered for the two back lights on the Linnton mill, but explains that the one farthest back is at the Clark & Wilson mill. This latter mill is nearly a quarter of a mile above the Linnton mill. I should judge, therefore, that there was a light at each of these mills, and that they were the lights referred to. These were electric arc lights. Accepting this statement as true—that he did steer for these arc lights—it will appear from an inspection of the government's chart that if he had kept his course he could not have collided with the Europe, for that course would have put the Annie Comings entirely outside of the ship's channel, and from 300 to 400 feet, or more, to the east of the ship's position. If Spinner had steered for Watt's dock, even then he would have passed on a straight course, from 100 to 200 feet east of the Europe, and along very near the east margin of the ship's channel at that point, but outside rather than inside of the channel. It cannot be, therefore, that Capt. Spinner pursued either a direct course for Linnton lights, or, as was his usual custom, for Watt's dock. He went decidedly to the west of either of these courses; and, if continued, the direction pursued would have thrown him in to the shore long before reaching Watt's dock; the dock, as has been stated, being situated yet above Clark & Wilson's mill. Spinner maintains that he saw no light on the Europe until his boat had come within 300 feet of her, when he discovered a light shade cast upon the water. It was then that he discovered an object before him, and very soon discerned it to be a ship. He thereupon ported his helm, with a view of going to the Europe's port side as she lay in the stream, intending, when his boat's course was changed, to straighten up his wheel and pass clear. But before he had time to make the latter maneuver his boat came in contact with the Europe, at an angle of about 45 degrees, the result being that his boat was broken in two, and sank.

It is admitted that the Europe was, in fact, carrying two lights— one forward and the other astern. The forward light, it has been shown, was elevated above the forecastle deck $17\frac{1}{2}$ feet, being 25 feet above the main deck. The forecastle deck is 100 feet in length, and extends back about midway between the foremast and the mainmast. The stern light was 17 feet above the main deck. It is disputed that the lights were bright white lights of the character required by the international rules to be carried upon a ship of the Europe's class and dimensions at anchor. But of this there can scarcely be a question. The forward lamp was of corrugated glass, and threw a light of $10\frac{7}{8}$ inches in diameter, which is quite sufficient for the purpose for which it was then used. It could be seen, according to competent and reliable witnesses, for a distance of two miles or more. The light at the stern was of about half the size of the one forward. Of this, however, there is but little controversy. Hence it may be premised as a fact established that the Europe carried at the time anchor lights sufficient in size, penetration, and range to come well within the require-

ments of the international rules for inland navigation. The logic of the situation and the strong contention, therefore, is that these lights were not properly placed in their elevation above obstructions to view, and were obscured so that they were not visible to a vessel approaching the Europe direct from her bow. The obstructions complained of consist in the forestay wound about with the chafing gear and the jib boom carrying furled upon it some headsails. The forward light, according to Capt. Crowe, a witness for libelant, was about on a level with the forward end of the jib boom. The same witness estimated, without exact measurement, that the light was about 37 feet above the water line. Further, it was shown that the height of the line of vision from the Annie Comings, in the pilot house, was between 32 and 33 feet, thus bringing the pilot upon the Comings below a range formed by the light and the jib boom in front of it. It should be stated that the forward light was 65 feet distant from the jib boom.

It can hardly be maintained that the forestay obscured the forward light, even to another vessel coming directly head on, because, by the greatest estimate of its size, it would not shut out the light from in front. The lamp exhibited a light to the extent of its full diameter, namely, 10⅞ inches, while the forestay, with its incumbrance, at most was but 9 inches. There is some question whether the forestay, with the chafing gear, was as much as 9 inches in diameter. One of libelant's witnesses says 8 inches, and Capt. Rollier, of the Europe, much less. But grant it to be 9 inches. Even then, a clear light would be thrown past the forestay to any position about the vessel. Further, it is manifest that, to a vessel approaching from the front, with but very slight deviation from a direct line, the entire light would be exposed, and unobscured to the vision. The jib boom would present the more serious obstruction, if the approach was in direct line from the bow. But this could not well have happened. The Europe was anchored by the bow, and was left free to swing with the current. An inspection of the government chart indicates very satisfactorily, by the soundings in the channel, that the current ran at angle with the apparent line of approach of the Annie Comings, so that at the time that boat headed for its course down the river at St. Johns, she was entirely outside of a direct line by something like 200 or 250 feet, and the forward light was without question within plain view of that position, notwithstanding the jib boom with the headsails furled upon it, and must have continued in full and fair view until she came within a short distance of the Europe, if the light was ever obscured at all. If this were not the case, it was practically impossible, from the very nature of things, for the Annie Comings to have approached the Europe on so direct a line for the distance she ran on her last course, with the current running strong, as not to have seen the light at frequent intervals during the time. An inspection of the government chart shows the distance of the course from 200 feet abreast of St. Johns to where the Europe lay to be practically one-half mile. A slight veering of the Annie Comings from one side to the other would undoubtedly have exposed the light to view, conceding that the jib boom obscured it from a direct line. So that, viewing the situation from either standpoint, it is not possible that the forward light upon

the Europe was obscured by the jib boom to the vision of the pilot upon the Annie Comings for any considerable length of time during the latter's approach to the former vessel. As Capt. Spinner says himself, when asked if he had confused the lights:

"And then the condition all the way from the bridge, had those lights been visible, as the current sets you over one way or the other, they are bound to change their position a little bit. It would be almost impossible to run a direct line in the river when the current is up. The current will take you one way or the other. And if you happen to see a light ahead of you—that is, on anything in the river, at a fixed point, especially if there is other lights behind you—you are bound to change the character of that light; that is, the position of that light one way or the other. It is impossible to run the boat straight in swift water."

And Capt. Crowe says:

"If I happened to get right fair in the line, right line ahead, I could not see it (the light) if my eye on the Annie Comings were below the level of that jib boom, or below the level of the light—could not see it at all. * * * In looking, I would have the end of the jib boom intercepting the light. If I were a little on one side or the other—I would not have to go but very, very little—then I would see it. * * * I would have to be out on one side. I would have to be either on one side or the other before I could see it. I would not have to be very far."

I am drawn irresistibly to the conclusion, therefore, that Capt. Spinner either saw the light or lights on the Europe, or was heedless and negligent of his lookout, presuming, as he was not warranted in doing, upon a clear way. He probably voiced by impulse his better judgment of the situation, as is related by McCullough and other witnesses, when his attention was called to the Europe's forward light then burning, by saying: "I mistook your lights for the lights of the Linnton sawmill." Capt. Spinner, it is true, is corroborated by A. E. McGraw, who was the lookout on the Annie Comings at the time, for the latter asserts that he saw no lights on the Europe until about the time of the collision. McGraw was inexperienced in boat service, however, and may not have been as watchful as his position required. No other person on the Comings was in a position to observe her near approach to the Europe.

It is now necessary that we take note of some principles of maritime law, in order to arrive at a proper solution of the controversy. It is urged that the Europe was improperly anchored in the fairway. No regulations have been brought to my attention requiring vessels to anchor in any particular locality in the Willamette river north of Portland. Being a seagoing vessel, of deep draft, one would expect the Europe to anchor in the ship's channel. If, however, there is any criticism to be made of her position, it is that she might have sought one nearer the margin of the channel one way or the other. If she had gone to the west side, no vessel would have passed to the west of her. And so it would have been as to the east side if she had been near that side of the channel. As she lay, there was ample room for free navigation upon either side. The Hassalo passed up stream on the west on the afternoon before the collision, and found no difficulty in navigation. The Europe was disposed where she lay by a competent river pilot, who was employed to tow her down the river; her

captain depending, no doubt, upon the experience and judgment of the pilot. The rule is, as it respects a vessel at anchor in the fairway, that she must take precautions commensurate with the danger she presents to shipping. If the danger is great, the care to prevent collision and accident from other ships navigating the water should be correspondingly great. If of lesser moment, the precaution may be diminished accordingly. The John H. Starin, 122 Fed. 236, 58 C. C. A. 600.

It is a rule that a moving vessel must keep out of the way of one at anchor. This because the one at anchor is practically helpless, and is usually so conditioned as to be unable to relieve herself readily in stress of emergency. The rule is applied with great strictness, the vessel at anchor being in a proper place. In such case the presumption of fault lies against the vessel in motion. This presumption, however, does not obtain where the anchored vessel was where she should not have been. A vessel anchored where she should not be must take the consequences of her own improper act. But in any event, whether she be in a proper place or not, or whether properly or improperly anchored, the moving vessel must avoid her, if it be reasonably practicable and consistent with her own safety. In support of these several propositions see 1 Parsons on Shipping, 573, 574; The Clarita and The Clara, 23 Wall. 1, 23 L. Ed. 146; The Virginia Ehrman and The Agnese, 97 U. S. 309, 24 L. Ed. 890; The D. H. Miller, 76 Fed. 877, 22 C. C. A. 597; Ross v. Merchants' & Miners' Transp. Co., 104 Fed. 302, 43 C. C. A. 538.

Another principle that should be stated in this connection is that a statutory rule adopted and designed to prevent collision should be scrupulously observed As an illustration, it was said in The Oliver (D. C.) 22 Fed. 848, 851:

"But the law of navigation which requires vessels lying at anchor in a fairway to have a light up is imperative. It must be obeyed. It must be effectively obeyed."

A reasonable and just corollary to this rule is another, namely, that a vessel in collision is presumed to be in the fault if at the time it was acting in actual violation of a statutory rule intended to prevent the occurrence. The presumption, however, is a disputable one, which may be, and is, overcome by competent proof that such unlawful action could not have been the cause of the collision. The Pennsylvania, 19 Wall. 125, 136, 22 L. Ed. 148; Richelieu Nav. Co. v. Boston Ins. Co., 136 U. S. 408, 422, 10 Sup. Ct. 934, 34 L. Ed. 398; The Bolivia (D. C.) 43 Fed. 173; The Providence, 98 Fed. 133, 38 C. C. A. 670; Ross v. Merchants' & Miners' Transp. Co., supra. I am not impressed that the Europe can be charged with being in an improper place, or a place where it ought not to have been. True, she was lying in the fairway, but she violated no rule of law or maritime regulation by taking the position she occupied.

A question is made that her lights were not adjusted as required by statute. Rule, or article, 11, as it is designated in the statute providing for lights on vessels at anchor, prescribes:

"A vessel under one hundred and fifty feet in length, when at anchor, shall carry forward, where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light in a lantern so constructed as to show a clear, uniform, and unbroken light visible all around the horizon at a distance of at least one mile. A vessel of one hundred and fifty feet or upwards in length, when at anchor, shall carry in the forward part of the vessel, at a height of not less than twenty and not exceeding forty feet above the hull, one such light, and at or near the stern of the vessel, and at such a height that it shall be not less than fifteen feet lower than the forward light, another such light. The length of a vessel shall be deemed to be the length appearing in her certificate of registry." Act Aug. 19, 1890, c. 802, 26 Stat. 324 (U. S. Comp. St. 1901, p. 2867).

The forward light being but 17 feet 6 inches above the forecastle deck, was it at the prescribed height for a vessel of the Europe's class? This depends upon the question whether the forecastle constituted a part of the hull of the ship. No authority has been cited elucidating the subject, and the bare definition of the word does not fully give the solution. Webster defines it as "the frame or body of a vessel, exclusive of her masts, yards, sails, and rigging." I have been referred to a marine dictionary by Capt. H. Paasch, entitled "From Keel to Truck," whereby it is said the hull "comprises the keel, stem, sternpost, propeller post (if any), keelsons, stringers, beams, decks, outside and inside planking or plating, etc., including also the frames; beams, inside and outside planking or plating of poops, forecastles, etc.; but exclusive of every equipment."

It is very probable, as Capt. Hoben, one of the witnesses, testifies, that the forecastle and poop of the ship were not originally considered a part of the hull for application of the rules, touching the placing of a vessel's riding or anchor lights, because they were of inconsiderable dimensions and located at the extreme end of the ship. It is yet true that upon many ships and craft of different classes these apartments are of minor consequence, and, as to them, it might be that they could not properly be considered a part of the hull. Other vessels, like the Europe, however, have forecastles reaching far back upon the ship, and their poops far forward. Indeed, the forecastle and poop decks combined are longer than the main deck between them. So it appears that the most extensive body of the ship, lineally speaking, is above the main deck, and I am inclined to think in such a case that the forecastle and poop—that is, the frame and housing thereof—should be considered a part of the hull of the ship, and hence that the regulation riding lights should be carried up accordingly. In this view, the forward light was too low by 2½ feet, and the stern light was not 15 feet lower than the forward light. There was, therefore, not a scrupulous observance of the law as it respects the placing of these lights.

The next inquiry, then, is, Was the collision occasioned by reason of the fact that these lights were not placed according as the law directs? It is manifest from the testimony, and from the nature of things, considering the approach of the Annie Comings, that the forward light was of ample capacity, and it ought to have been seen in the position in which it really was at all times, unless it was when the Comings had gotten near under the prow of the Europe. It was sufficient, therefore, to give abundant warning of the ship's presence in

the stream or fairway. Suppose the ship had been one of less than 150 feet in length, the light would have been technically at the proper height, and no complaint could have been made that it did not meet the requirements of law. Yet such a light would not have been more serviceable in giving warning of the ship's position than the one found upon the Europe. Capt. Crowe says the light was in the usual place, but that it was not hung as high as the statute requires, by reason of not being 20 feet above the forecastle deck. But if it shed light about the ship as it would have done if the ship was but 150 feet in length, why was it not sufficient to give the requisite warning to other navigating craft? It cannot be that the less than statutory elevation of the foremost light was a cause conducing to the collision.

The more serious criticism is that the two anchor lights which the vessel was required to and did carry were not adjusted as to height in the proper relation to each other. The light at the stern was but 8 feet lower than the forward light, when it should have been 15. It may be that the pilot on the Comings heedlessly mistook the lights on the Europe for the Linnton lights, and I think probably he did. If so, even in this he was grossly negligent, as he should have known every light on the stream in that vicinity. He says he did know them thoroughly. Hence there was no reasonable occasion for the mistake. It is hardly possible, under the evidence, that had these lights on the Europe borne the proper legal relation one to the other as to their height above the deck, they would have attracted the attention of the pilot as being anchor lights upon a ship, and thereby have caused him to proceed with greater precaution, and enabled him to avoid the collision. But however this may be, libelant cannot insist upon this feature as a cause of the collision. Its whole theory of the case is that the lights were obscured, and that that was the cause of the collision. The pilot swears to this, and the lookout swears to it. If obscured, then the relation which the lights bore to each other could have nothing whatever to do with occasioning the collision. Furthermore, how is the court going to say that such relation was a contributing cause, when the chief witnesses for libelant attribute the cause to a totally different and inconsistent fact, namely, that the lights were obscured, and that they were not observed at all in the approach of the Comings until within such close proximity that the accident could not be avoided? The libelant having brought the case into court, the burden of proof rests upon it. Hence if it would prevail, it must prove a delinquency on the part of the respondent sufficient to account for the collision. The Clara, 102 U. S. 200, 202, 26 L. Ed. 145. In the particular under discussion, the libelant has not sustained the burden. I am of the opinion, however, that the position of the lights on the ship had nothing to do with the collision, but that it is attributable wholly to the reckless and negligent navigation of the Comings.

It is next urged that the Europe was in fault because it did not have a proper anchor watch aboard at the time. The proof shows that it did have a watch aboard, but he was on the main deck of the ship, and did not observe the lights of the Comings, or her approach, because behind the forecastle deck: hence the exact contention is that the watch was not where he ought to have been, and that had he

been on the forecastle deck at the time, he might have obviated the collision by letting go the anchor chain. It appears that the anchor chain was so fastened that it could be easily let go. When the Comings struck the Europe, the chain did slip two shackles, and after contact, it was let go another two shackles. It is not possible, however, had the watch been convenient, that he could have let go the chain, after the danger became manifest, in time to avoid the accident. Capt. Spinner says when he first observed the danger he was within 300 feet of the Europe, and that the collision occurred in about three seconds thereafter. It would have taken very quick work on the part of the watch to relieve the situation in three seconds. In the case of The Clarita and The Clara, 23 Wall. 1, 23 L. Ed. 146, it was held that, inasmuch as it was shown that the vessel was in a proper place, and that one of her crew was on deck, the charge of fault for want of a proper watch was not sustained. In that case the vessel was set on fire by a boat adrift, and it was contended that, if an anchor watch had been at his post, the accident could have been avoided by letting go the vessel. The contention, however, was not sustained. Some authorities are cited where liability was adjudged by reason of lack of diligence on the part of the anchor watch in failing to let the ship have chain, or in throwing the helm so as to allow the craft to swing out of the way of passing boats, but none of these are controlling here, because the facts are entirely dissimilar. For instance, in The Ogemaw (D. C.) 32 Fed: 919, 925, the court says:

"The second mate and seaman, constituting the anchor watch, saw the Ogemaw and her tow approaching a long distance off. It was their duty to be alert, and to call assistance from below promptly. The danger was especially apparent when they saw, as they must have done, that the tow was a long one, and that each succeeding vessel, as it passed, came in closer proximity to the Richards. If her helm had been promptly put to port, and thus, by the force of the current, the stern of the vessel had been worked over to leeward, and the bow turned off to starboard, and if, in addition to this, more anchor chain had been run out, thus allowing the vessel to drop down the stream with the current, and if all this had been done, as it might have been, before a collision was actually impending, it is highly probable the collision would have been avoided, or that the damages occasioned thereby would have been lessened."

So in the Richmond, 63 Fed. 1020, 1021, 12 C. C. A. 1, 2, it is said:

"The man acting as anchor watch upon the Richmond saw the flotilla approaching when it was a considerable distance away. A man upon one of the rear boats of the flotilla shouted to him to give the Richmond chain. If he had done this, the tide would have carried her back and out of danger. He testifies that he attempted to let out the chain, but did not succeed. As the boats struck, the mate of the Richmond came on deck, and immediately let out the Richmond's chain. With the strong tide then running, it is apparent that she would have readily swung back if the chain had been seasonably released. Upon these facts, we think it very clear that fault is to be imputed to both the Heipershausen and the Richmond."

And in The Santiago (D. C.) 160 Fed. 742, 744, these facts were shown:

"About five minutes before the collision Fidelis Mattis, who was on watch, discovered the light in the stern had blown out. It was reported to the captain who directed him to take it to the pilot house and relight it. While thus engaged the collision occurred. There was no watchman on the deck of

the Santiago at the time, and the stern light was out, and at about the point where the light should have been is where the pilot boat came in contact with the barge."

Hence the ship at anchor was held in fault. Other cases of like tenor may be cited, but their analogy is so remote as to be of little assistance.

Finally, I conclude that the Europe was not anchored in an improper place, but was so anchored as to require of her great care in protecting other navigating vessels against collision; that she carried two lights, of requisite size and dimensions, so placed, and without substantial obstruction, that they could be seen for a distance of two miles or more; that the forward light was not carried to the proper height, by 2½ feet, required by the statutory inland rules for a vessel at anchor of the class of the Europe; that the aft light was not hung at a point 15 feet below the forward light, nor more than 8 feet lower; that the Europe had a watchman on board at the time of the collision, but not in a position just then to discover the approach of the Annie Comings; that the navigators on the Annie Comings either saw or ought to have seen the lights on the Europe, and distinguished them as riding lights upon a vessel at anchor, and that they were grossly negligent in allowing their boat to come into collision with the latter vessel; that the position of the lights on the Europe contrary to the regulations of law manifestly could not have contributed as a cause to the collision; and that the Europe was supplied with a competent and proper watch, and if not upon the forecastle at the time, the fault, if it be a fault, could not, in all reasonable probability, have contributed to the cause of the accident. I therefore find the Annie Comings liable and the Europe free from fault. The respondent is entitled to the following sums as damages:

| | |
|---|---:|
| Repairs on ship Europe | $1,100 00 |
| Amount paid L. Veysey | 55 00 |
| Andrew Hoben | 20 00 |
| C. Henri Labbe | 38 05 |
| French shipmasters | 30 00 |
| 18 days' delay, at $101.99 | 1,835 82 |
| Total | $3,078 87 |

The earning value of the ship, including the daily outlay for the ship's crew and the subsistence for master and crew, is ascertained by taking the gross receipts, during a period of 5 years less 20 days, and deducting therefrom the gross expenditures exclusive of such as were paid the crew and for subsistence of master and crew. The daily average gives the result $101.99. The collision occurred in the evening of the 30th of December, and her repairs were completed January 17th following, thus making 18 days of delay.

In addition to these sums, it is claimed that the respondent is entitled to recover the amount of premium paid and agreed to be paid in securing a bond for $41,000 for the release of the ship. The rate of premium agreed upon is 1 per cent. upon the amount of the bond for the first three months; thereafter to be increased monthly by one-eighth of 1 per cent. The respondent is entitled to recover a reason-

able sum for expenditures in securing such a bond. The South Portland (D. C.) 95 Fed. 295; Jacobsen v. Lewis Klondike Expedition Co., 112 Fed. 73, 50 C. C. A. 121. I am impressed, however, that the premium which the respondent has agreed to pay for this bond is exorbitant, and ought not to be allowed in full. As I am without sufficient data to determine what would be a reasonable premium to be charged, I will hear further testimony upon the subject, and withhold judgment until the testimony is adduced.