THE GOV. AMES. THE LEJOK. SMITH v. DAVIS et al.

(Circuit Court of Appeals, First Circuit. December 28, 1910. On Petitions for Rehearing, May 29, 1911.)

Nos. 858, 859.

1. COLLISION (§ 29*)—SAILING VESSELS—NAVIGATION RULES—"WIND AFT."
    Within the meaning of International Navigation Rules, art. 17, subd. e, 26 Stat. 326 (U. S. Comp. St. 1901, p. 2869), which provides that the one of two sailing vessels which has the wind aft shall keep out of the way of the other, a vessel has the "wind aft" when it is not more than 2½ points from directly aft.
    [Ed. Note.—For other cases, see Collision, Cent. Dig. § 27; Dec. Dig. § 29.*]

2. COURTS (§ 98*)—INTERNATIONAL RULES—CONSTRUCTION—ENGLISH PRECEDENTS.
    It is essential to the effectiveness of the international navigation rules that there should be close conformity between the admiralty courts of England and the United States in the interpretation of such rules, and for that reason, as well as because of the eminent ability of the judges composing them, the admiralty decisions of the higher English courts are given high consideration as precedents by the admiralty courts of the United States.
    [Ed. Note.—For other cases, see Courts, Dec. Dig. § 98.*]

3. COLLISION (§ 136*)—DAMAGES RECOVERABLE—DETENTION OF VESSEL.
    Where a vessel was injured in a collision, for which the other vessel was in fault, during a voyage, and her detention was not such as to require the discharge of her crew or prevent her from completing her voyage, the rule is settled that the agreed demurrage under her charter may properly be accepted as fixing prima facie, the amount of her damages for the detention.
    [Ed. Note.—For other cases, see Collision, Dec. Dig. § 136.*]

4. COLLISION (§ 154*)—ACTION—COSTS—AMOUNT PAID FOR SURETY BOND FOR RELEASE OF VESSEL.
    The amount paid by the owners of a vessel libeled for collision to a surety company for furnishing stipulation for discharge of the vessel is not taxable as costs against the other party on his failure to recover.
    [Ed. Note.—For other cases, see Collision, Dec. Dig. § 154.*]

5. ADMIRALTY (§ 121*)—COSTS—DISCRETION OF COURT.
    The discretion of a court of admiralty in the allowance of costs is limited to an apportionment between the parties of costs legally taxed.
    [Ed. Note.—For other cases, see Admiralty, Dec. Dig. § 121.*]

Appeals from the District Court of the United States for the District of Massachusetts.

Suit in admiralty by Charles L. Smith, as owner of the schooner Lejok, against the schooner Gov. Ames, Cornelius A. Davis and others, claimants, for collision, and cross-libel against the Lejok. Decree for cross-libelants, and libelant appeals. Modified and affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Edward E. Blodgett (Blodgett, Jones & Burnham, on the brief), for appellant.

Frederick M. Brown (Wallace, Butler & Brown, on the brief), for the cargo of the Lejok.

Edward S. Dodge (Benjamin Thompson, on the brief), for appellees.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

PUTNAM, Circuit Judge. This is a case of collision, occurring at about half past 1 o'clock on the morning of March 22, 1906, between the schooner Lejok and the schooner Gov. Ames. There were cross-libels. The Lejok was three-masted, loaded with lumber, on a voyage from Brunswick, Ga., to New York City. Her libel alleges that she was approaching Sandy Hook, was steering northwest, with the wind "about S. S. W.," that she was sailing free on the port tack, and proceeding at a rate of about five knots. It also alleges that her lookout saw and reported the green light of the Gov. Ames on her port bow, and that her master was at the wheel, and that he was of the opinion that the Gov. Ames had the right of way, and he changed his course to port until the green light of the Gov. Ames was seen to open up on the starboard bow of the Lejok, when he steadied his vessel so that the two would pass green to green. It also says the weather was clear and starlight. It maintains that the Gov. Ames suddenly changed her course, shutting out her green light and showing her red light a little on the starboard bow of the Lejok; that thereupon the master of the Lejok immediately put his wheel hard up to avoid a collision, if possible, and the Lejok swung to starboard. Nevertheless, it says the time and distance were too short, and the two vessels came together nearly head on. The Lejok still claims that the Gov. Ames was on her starboard tack, running at a high rate of speed, and that it was her duty to hold her course.

The answer of the Gov. Ames denies that she had the right of way. It proceeds that she was a five-masted schooner, and was bound on a voyage from Newport News, Va., to Boston, Mass., with a heavy cargo of coal; that the wind was S. W. by S. and strong; that she was sailing on a course N. E. ½ E., and running about 10 knots; that the wind was about 1½ points on her starboard quarter; that, while thus proceeding, her lookout saw the red sidelight of the Lejok about 1½ or 2 points on the starboard bow and from one-half of a mile to a mile distant; that the Lejok was being overtaken by the Gov. Ames; that, as the Gov. Ames had the wind aft, and also as she was the overtaking vessel, her mate ordered her helm put hard to port, and she at once began to luff; that the Lejok luffed also, so that she showed both her sidelights to the Gov. Ames; that the Gov. Ames continued to luff, but the Lejok also continued to luff, so that the two vessels came into collision.

The cross-libel of the Gov. Ames and the answer of the Lejok thereto left the case substantially the same as the pleadings on the Lejok's libel, so that they need not be restated.

Aside from the above, the facts are detailed fully in the opinion of

the learned judge of the District Court, so that there need not be any further general statement in reference thereto. It will be seen that the Lejok claims that she was sailing free on the port tack, so that she was bound to keep out of the way of the Gov. Ames; while the Gov. Ames claims that she had the wind aft, so that she was bound to keep out of the way of the Lejok. The Lejok, of course, claims that the Gov. Ames was on her starboard tack.

The case turns on articles 17, 21, 22, 24, and 27 of the International Rules of July, 1897 (26 Stat. 326, 327 [U. S. Comp. St. 1901, pp. 2869–2871]), as follows:

"Art. 17. When two sailing vessels are approaching one another, so as to involve risk of collision, one of them shall keep out of the way of the other, as follows, namely:

"(a) A vessel which is running free shall keep out of the way of a vessel which is close-hauled.

"(b) A vessel which is close-hauled on the port tack shall keep out of the way of a vessel which is close-hauled on the starboard tack.

"(c) When both are running free, with the wind on different sides, the vessel which has the wind on the port side shall keep out of the way of the other.

"(d) When both are running free, with the wind on the same side, the vessel which is to the windward shall keep out of the way of the vessel which is to leeward.

"(e) A vessel which has the wind aft shall keep out of the way of the other vessel."

"Art. 21. Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

"Art. 24. Notwithstanding anything contained in these rules every vessel, overtaking any other, shall keep out of the way of the overtaken vessel.

"Every vessel coming up with another vessel from any direction more than two points abaft her beam, that is, in such a position, with reference to the vessel which she is overtaking, that at night she would be unable to see either of that vessel's side lights, shall be deemed to be an overtaking vessel; and no subsequent alteration of the bearing between the two vessels shall make the overtaking vessel a crossing vessel within the meaning of these rules, or relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear."

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

We do not regard the Gov. Ames as the overtaking vessel within any reasonable construction of article 24, and therefore drop that proposition from further consideration.

With reference to article 27, there is much in the case to suggest very strongly that, under the circumstances, both vessels should have regarded it. Apparently there was no occasion for the collision. There is much to suggest that, with regard to the application of article 17, there was a misapprehension on the part of both vessels as to the position and course of the other, and also to suggest that each vessel should have understood that there was a liability to such misunderstanding, and should have proceeded accordingly with a caution which would have avoided a collision, and therefore that both vessels

were at fault; or that, according to The Theodore H. Rand, 12 App. Cas. (1887) 247, 251, each might have been excusable to a certain extent. But the case has not been submitted to us from those standpoints, and we are not able safely to adjudicate it in the light of these suggestions, nor is it our duty to do so. Neither has it been pointed out to us that article 27 has any application here in any other respect.

The learned judge of the District Court found that the Gov. Ames had the wind on her starboard quarter within three points from directly aft, and that she therefore had the "wind aft" in accordance with paragraph "e" of article 17. He was careful to use the word "within." With the wind as fixed by the Lejok, the maximum was 2½ points, and as fixed by the Gov. Ames 1½ points. Therefore the learned judge stated a very considerable margin. We are safe to leave it 2½ points.

The Theodore H. Rand points out specifically the difficulty involved under somewhat similar circumstances in the attempt of one sailing vessel to ascertain the course and position of another sailing vessel between 4 and 5 o'clock on a February morning. Indeed, it must be regarded as a proposition favored by the courts, and fortified by marine experience, that, unless some extraordinary circumstances produce special proofs, the course of a vessel in the night is to be determined chiefly by the testimony of those aboard her. Undoubtedly, the circumstances here require us to accept the evidence of the master and crew of each vessel as to her course and position, and as to the direction of the wind by which her movements were guided. Therefore we accept the testimony from each as to her position, resulting in the fact that we find that the Gov. Ames had the "wind aft," if 2½ points from directly aft is within the meaning of the statute, and more especially so if the wind was only 1½ points off, as stated in her answer.

With reference to the interpretation to be given the words "wind aft," the only decisions of importance are The Spring, L. R. 1 A. & E. 99 (1866), decided by Dr. Lushington under the Regulations of 1863, and The Privateer, 9 L. R. (Irish) 105 (1881). The Spring is directly in point, and was decided in the High Court of Admiralty, over which Dr. Lushington presided, and from which appeal then lay only to the Privy Council. The case was not appealed, and has never been overruled or judicially questioned in England. The Lejok says it was doubted in Marsden on Collisions (5th Ed.) 385, but such is not the fact. In discussing article 17, at page 383 and sequence, Marsden speaks in what might be said to be a general way of the unsatisfactory forms of expression found therein, and he states that the classification of sailing ships in that article occasions some difficulty; but he does not dwell at all on the words "wind aft." On the other hand, he states at pages 385 and 391 that in The Spring the Constantine, which was the colliding vessel, had the wind from two to four points from dead aft, and was held to have had the "wind aft" within the meaning of article 12 of the Regulations of 1863. There is no way of discovering that any effect is to be given those words in the Regulations of 1863 different from the effect to be given to the Order in Council of November, 1896, which was under discussion by Marsden, which are

identical, so far as this case is concerned, with the United States Regulations applicable here, namely, those of July 1, 1897. Of course, article 12, which was under interpretation in The Spring, distinguished as to vessels to the windward and to the leeward; but it contained as a fundamental condition the words "wind aft." In Parsons on Shipping and Admiralty (1869) at pages 592 and 594, The Spring was cited and an abstract given of the decision, without any question in reference to it. Thus it has stood since 1866, unchallenged by any tribunal authorized to challenge it.

It is claimed, however, by the Lejok that The Spring fails to make any explanation, or any reference to previous authorities. It is true that it states its results as briefly as possible. Yet, at the time of that decision, Dr. Lushington had presided over the High Court of Admiralty for 26 years. During that period, every case in England in admiralty of any importance had passed under his hand; and he had a right to dispose of a proposition which, in his experience, he had come to regard as beyond question without elaborating in reference thereto. The fact that Dr. Lushington made no discussion strengthens his conclusions rather than weakens them. In applying The Spring it is not to be understood that Dr. Lushington gave absolutely so wide a margin as four points. A study of the case shows that the wind was boisterous, and was fluctuating, at least two points; so that The Spring establishes a margin of at least two points, which is as much as appears in these cases now on appeal.

Stowell was the only admiralty judge of the last century, or the century previous thereto, who ranked Lushington for eminence and experience. When The Spring was decided Dr. Lushington was 84 years of age, if we have correctly computed. He retained his judgeship so long as he lived, that is, until he was 92. The interesting book entitled "The Builders of Our Law During the Reign of Queen Victoria," published in 1895, declares that during his whole career he was living up to his time, and was alive to everything that happened, and took as keen an interest in modern science and discoveries as if he had been but 19 instead of 92. His whole life, public and domestic, shows that he always remained with a sane mind in a sane body, so that at the time The Spring was decided there had been no failure in any of his faculties. The same author declares that, in the admiralty court, his consummate ability and address especially signalized itself in a long series of admirable judgments, which are described as masterpieces of judicial wisdom and legal learning. Without elaborating further in this direction, the general statement must be accepted, that he, as well as Lord Stowell, contributed in a very large degree to laying the foundations of the admiralty law in many respects, as now applied not only in England but in the United States. From every point of view, so long as The Spring remains, as it has remained, not reversed by an appellate tribunal, it represents the practical law. i England on the point which we are discussing. Therefore it must be accepted in this country until the Supreme Court speaks to the contrary, if it ever does.

This is not only on account of the weight ordinarily given by our courts to adjudications in admiralty of the higher English courts, but

also because of the practical necessity of harmonizing the interpretations of the statutes of both countries with regard to questions under the International Rules of Navigation. The reasons for close conformity with reference to the so-called International Rules of Navigation are at once apparent, because, no matter how explicit the mutual commands of legislation in regard thereto, there would cease to be any such rules when the courts of the United States and of England fail to regard the interpretation which the other places thereon. This is pointed out in The Siren, 13 Wall. 389, 392, 393, 20 L. Ed. 505, and in the peculiarly philosophical way in which Mr. Justice Strong was accustomed to explain the law, in The Scotia, 14 Wall. 170, 20 L. Ed. 822 (1871). After describing at pages 183, 184, and 185 of 14 Wall. (20 L. Ed. 822), the embarrassments which come from lack of harmonious legislation or judicial decisions with reference to navigating the seas, the opinion concludes, at page 188 of 14 Wall. (20 L. Ed. 822), with regard to the law of the sea as incorporated in the rules which were then gradually developing into the International Rules as now known:

"This is not giving to the statutes of any nation extraterritorial effect. It is not treating them as general maritime laws, but it is recognition of the historical fact that by common consent of mankind these rules have been acquiesced in as of general obligation."

In this connection, it is of much importance and weight that Marsden's Collisions at Sea (5th Ed. 1904) 320, adopts as a part of its text expressions of Judge Benedict as follows:

"The paramount importance of having international rules, which are intended to become part of the laws of nations, understood alike by all maritime powers, is manifest; and the adoption of any reasonable construction of them by the maritime powers named affords sufficient ground for the adoption of a similar construction of our statute by the courts of this country."

The Privateer, already cited, was decided on appeal by the highest judicial tribunal in Ireland; the Master of the Rolls and one of the Lord Justices of Appeal sitting. The decisions of the Irish courts, although entitled to respect, are in no way binding on the English judges. Stockley v. Parsons, 45 Ch. Div. (1890) 51, 62; Annual Practice (1903) vol. 2, 347. Nevertheless, the reasoning of the two opinions delivered in The Privateer has clear earmarks of experience, sound consideration, and knowledge of maritime law on the part of those who delivered them. They have been criticised with reference to points not involved here; but the decisions that criticised them are themselves subject to criticism, and have not yet been fully established. We do not, however, need to rely on The Privateer, as we think we have already made clear.

We should make reference to essays on the law of maritime navigation coming from distinguished French and German sources, cited in behalf of the owner of the cargo which was lost with the Lejok. It is sufficient to say that these are not judicial determinations like The Spring, and therefore are not entitled to any particular judicial obeisance, and that they are well balanced by The Privateer; but the most emphatic thing is that, for reasons easily understood, the federal courts would be exceedingly embarrassed by coming in conflict on questions

.of the rules of navigation with the courts of the Empire of Great Britain, which controls such a large mercantile fleet, much more so than by coming in conflict with the courts of France and Germany combined. As the case now stands before us, the result of the latter would be merely a possibility, while with reference to English judicial decisions, such a conflict might create present practical difficulties of serious consequences. We feel bound, therefore, to agree with the learned judge of the District Court that the Gov. Ames had the "wind aft," or was sailing "before the wind," whichever expression may be used.

We have endeavored to get some light on the case from the historical view, but we have not gained anything of consequence in that way.

In Flanders' Maritime Law (1852) § 369, the rule is given the same as the present statutory rule; but the expression is "a vessel going before the wind." That expression, of course, is flexible and better fits the contention of the Gov. Ames. The expression in 3 Kent, 230, is also "before or with the wind." St. John v. Paine, 10 How. 257, 581, 13 L. Ed: 537 (1850), used the same expression, "before or with the wind." The presumption is against a disturbance of existing practices by the statutory rules of navigation. The embarrassments imposed on those responsible for the navigation of particular vessels is so much increased by changes in the law that this presumption is strongly supported by the good sense of the thing. However, all efforts to reach a conclusion by this method of examining the question have not satisfied us, and we are content to stand on the authorities we have cited.

We now come to the special case which the Lejok makes against the Gov. Ames to the effect that, even if the Lejok was in error, the Gov. Ames was also in fault. The proposition is stated to us by the Lejok in very general terms: "Lack of proper lookout"; "lack of a competent officer in charge of the deck"; lack of a competent man at the wheel"; "in not standing by." The last—that is, the allegation that the Gov. Ames did not stand by as the statute requires—we are content to leave on the statement of facts and reasoning of the learned district judge in reference thereto. As to the other points, the main burden of the argument in behalf of the Lejok we have already considered, namely, that the Gov. Ames did not have the wind aft; and very little is given us on the points to which we have just referred. It might well be so, because those touch a question of lookout; and the question of lookout on these proceedings is not a primary question. There is no such question here in the ordinary understanding of that topic. It comes in only incidentally.

On the mere question of lookout in the ordinary sense, a strong case might appear against the Gov. Ames. Although the night was clear, so that the Gov. Ames' light was seen at least two miles from the Lejok, no light was seen by the Gov. Ames until the Lejok was within a mile, or three-quarters or one-half of a mile, as put differently several times. The fact is that the mate of the Gov. Ames who gave the orders for her navigation apparently saw no light from the Lejok until the Lejok was close aboard. Although he declares at one place that he saw the red light of the Lejok three-quarters of a mile away, yet this is inconsistent, because he says at another place that, when he

saw this light, he immediately ordered his wheel hard down, "within two or three seconds, as soon as I looked and saw it." He also says that he "assisted in placing the wheel hard down for all it was worth." In another place he says, "the lookout sung out, 'Light on the starboard bow.'" And he adds: "Saw the red light just as if it had been throwed up at me; came into view all at once." Thus he saw the red light for the first time, and immediately put his wheel hard down. Of course, with reference to the claim that the Gov. Ames was in fault for not sooner seeing the lights of the Lejok, and with reference also to the claim that this was one of the contributing faults bringing about the collision, so that the Gov. Ames was also guilty, the burden rests on the Lejok to support both propositions. What we have cited might well sustain the first proposition; but the case as a whole is absolutely deficient on the second, as we will see by re-examining the Lejok's allegations, and comparing them with the proofs, or lack of proofs, from her in this particular. The allegations of the Lejok's libel are as follows: The Lejok sighted the green light of the Gov. Ames on her port bow. Thinking that the Gov. Ames had the right of way, the Lejok's libel alleges that her master "changed his course to port until the green light of the Gov. Ames was seen to open up on the starboard bow of the Lejok, and then steadied his vessel so that they would pass green to green in safety, and at that time the vessels were about a quarter of a mile apart"; but that shortly after this the lookout of the Lejok saw the Gov. Ames suddenly change her course, shutting out her green and showing her red light. This, of course, is directly contradicted by the testimony of the mate of the Gov. Ames, which was, in substance, to the effect that the red light of the Lejok was right aboard of him when he saw it, and thus plainly at a time when it was practically impossible to avoid a collision. However, we are not dealing at present with this contradiction. If the Lejok came around green to green, had steadied there with the vessels a quarter of a mile apart, and so remained until the Lejok afterwards saw the Gov. Ames change her course, showing her red light, there would have been time, if the deck of the Gov. Ames had been vigilant, to have discovered that the Lejok had made a mistake, and to have kept the course green to green and thus avoided a collision. The difficulty is that the Lejok fails to call our attention to any proofs whatever sustaining these allegations of her libel. If she had done so, then we would have been compelled to investigate the question of veracity with reference to the testimony of the mate of the Gov. Ames, and to determine as to the truth of the allegations of the Lejok which we have cited. Consequently, we are compelled to concur in the conclusions of the learned judge of the District Court, because we find that the Gov. Ames had the "wind aft," and because on the record as given us the Lejok was bound to hold her course; and we are unable to convict the Gov. Ames of fault for the reasons we have stated.

This disposes of the merits of the case, but there are some minor questions brought to our attention. The District Court, besides adjudging against the Lejok the costs of repairs, gave the Gov. Ames an allowance for 11 days' detention at the rate of freight fixed in her charter party. The collision occurred during her voyage, and she was

not called on to discharge her crew or terminate her charter. The detention was only a moderate one. She was therefore not called on to discharge her officers and crew; and the court, so far as we can understand, awarded an allowance for detention in accordance with the common practice under the circumstances. It seems to us that the only point the Lejok made was that the allowance for detention should be the net earnings of the Gov. Ames. This is absurd, except in very extraordinary cases. Here it is, of course, the gross earnings. As the Lejok puts in no qualifying proofs, the Gov. Ames was only required to make a prima facie case. In England the practice is to allow an arbitrary demurrage, a certain number of shillings per day; but the practice in this country is clearly pointed out by Judge Butler in The Rebecca v. The America, Fed. Cas. No. 11,619a. Without accepting any decision of his court as binding us, we accept his testimony as that of a judge of long experience and truthful mind, permitting the adoption by us of the prima facie rule, which rule is that of the agreed demurrage. Judge Butler said that this rule "has been pronounced, by those having the largest experience and the highest intelligence on the subject, the safest thing under general circumstances that can be pursued."

In the taxation of costs the court allowed $393.75, the amount paid by the Gov. Ames to the surety on the stipulation for her discharge from the libel. We are unable to perceive why the Lejok should be taxed for this, any more than for solicitors' fees or counsel fees, or for many other disbursements which defenders in litigation are accustomed to make, but which never have been recognized as constituting taxable costs. In this particular case, a surety company joined in the stipulation; but this constitutes no essential difference between this and the ordinary stipulation entered into by individuals. Commissions on disbursements, commissions for collection, and even commissions to sureties in foreign ports releasing cargoes and vessels, are often allowed in adjusting general average, and even in adjusting particular average; but there is no practice recognizing them as elements of costs to be taxed in litigation. This claim is not supported by any order of court, or by any statute. It is ordinarily a mere matter of choice on the part of the owner of a vessel whether he will bond her, allow her to remain in the custody of the court, or ask to have her sold. In Ex parte Hughes, 114 U. S. 548, 5 Sup. Ct. 1008, 29 L. Ed. 281, an allowance claimed for the printing of briefs was denied, but the printing of what was, in the nature of pleadings, a part of the record, was allowed. Both rested on the fact of usage, which the court saw no justification in disturbing; but no usage is available here.

Many citations have been made, but none of them are authoritative with us except Lee Co. v. Penberthy Co., 109 Fed. 964, 48 C. C. A. 760, decided by the Circuit Court of Appeals for the Sixth Circuit, on June 15, 1901. There the amount paid a surety company for furnishing an appeal bond was stricken out of the taxation. It is true that the Circuit Court of Appeals for the Ninth Circuit, in Jacobsen v. Expedition Co., 112 Fed. 73, 80, 50 C. C. A. 121, decided October 7, 1901, allowed the cost of giving security in damages by a respondent who filed a cross-libel. In that case the security was required by Ad-

miralty Rule of the Supreme Court 53, so that there was there behind the expenditure at least the requirement of the rule. The opinion, however, cited a number of cases, none of which fairly support the allowance. Likewise, the allowance of the premium on a bond for costs in The Volund (by the Circuit Court of Appeals for the Second Circuit) 181 Fed. 643, 667, was apparently based in the same manner on the fact that the bond was required by the rules of the court of the first instance. As therefore in this case there is neither usage nor any court order, the objection of the Lejok to the allowance of this item of costs is sustained; and this without determining what would be the effect of an order if there had been one.

The Lejok raises another question of costs, based on the fact that some witnesses, if not all of them, were allowed in behalf of the Gov. Ames travel for distances beyond the extreme limits to which subpœnas can run. We understand that this relates to the cross-libel in behalf of the Gov. Ames. On the one side, we are told that the District Court had no power to award travel for such extended mileages, and, on the other, that we have no power on appeal over this question. It is time we should cease to hear from each of these propositions. The City of Augusta, 80 Fed. 297, 25 C. C. A. 430. The Gov. Ames also falls back on an incorrect statement with reference to the discretion of courts in equity and admiralty in the allowance of costs. Before the act of 1853, there was such a discretion in the broad sense of the word, even an allowance of counsel fees having been sustained by the Supreme Court; but, since that statute, the settled practice is to limit this discretion to an apportionment between the parties of costs legally taxed.

We have no specific ruling of the District Court on the questions made here; nothing except a brief memorandum that, on appeal to the court, the clerk's taxation was upheld. Among other allowances for mileage was that for one witness, Lima, 7,382 miles, from the Cape DeVerde Islands. We have in the record the certificate of witnesses which is erroneous in form, although customarily used, and sufficient where there is no controversy. It states the "place from which each came to attend trial," meaning by "each" each witness; while section 848 of the Revised Statutes allows mileage only from the place of residence to the place of trial. Every witness, so far as we have examined, in the opening of his testimony, stated the place of his residence, which fails to conform in very substantial extent to this certificate. For example, Lima, whose travel is taxed from the Cape De Verde Islands, testified that he lived in New Bedford. As to him, there is nothing else in the record which the court can recognize as proof, because, on a contest, we must reject the certificate signed by the witnesses in its existing form. It is true there is an affidavit from Davis, one of the owners of the Gov. Ames, as to Lima's residence; but that is based entirely on information. As to the other witnesses whose sworn residences fail to conform to the certificate, there is not even any affidavit. It is necessary, therefore, that the mileage allowed witnesses be made to conform to legal proofs.

We will observe further with reference to Lima that the mileage

187 F.—4

allowed was $369.10. The rule permitting taxation of travel beyond a point where a subpœna can reach a witness is peculiar to this circuit. It was adopted by us in The City of Augusta, 80 Fed. 297, 304, 25 C. C. A. 430, for the reason that we concluded to abide by the long-continued construction of the law given by the federal judges in this circuit. We have never expressly approved it as consonant with our own views of the law. It is liable, as it is easy to see, to great abuse unless its application is in some way checked or limited. For instance, in the present case, it is evident that the amount allowed Lima, or, rather, to the Gov. Ames on account of Lima, is far in excess of the cost of making the voyage to one of Lima's position in life; and other cases are likely to arise where the doubtfulness of the allowance from a mere point of natural justice or injustice may be much greater. We are not at the present time called on by either party to enter on that topic; and we only go to the extent of holding that, if the rule which is practiced in this circuit is to be applied in the present case, it must be as the result of proofs which strictly accord with the law. Therefore, so far as these costs of travel are concerned, they must be revised by the District Court without being controlled by any further suggestions from us.

We find with the papers what appears to be an attempt to raise an objection on the part of the Lejok to a ruling of the court with regard to the admission or nonadmission of evidence. It is not, however, put in such form as to be easily comprehended; neither do we find it covered by any assignment of errors. Therefore we pass it by.

In No. 858, Smith v. Davis, The Gov. Ames, the decree of the District Court is affirmed, and the appellee recovers his costs of appeal.

In No. 859, Smith et al. v. Davis et al., The Lejok, the decree of the District Court is modified by striking out from the costs the sum of $393.75 for premiums paid, and by a revision, to be made by the District Court, of the taxation of costs for travel of witnesses on behalf of the Gov. Ames; as thus modified, the decree is affirmed with interest. The appellees recover their costs of appeal; and the case is remanded for proceedings accordingly.

LOWELL, Circuit Judge, concurs in the result.

On Petitions for Rehearing.

Before COLT and PUTNAM, Circuit Judges.

PUTNAM, Circuit Judge. These cases were very elaborately argued, and received a great deal of consideration from the court, and a careful observance of all the rights of all the parties, and yet both parties have filed petitions for rehearing. Under the special circumstances referred to, and because these petitions particularly illustrate the propriety of calling attention to the proper rules in reference to petitions for rehearings, we quote Public Schools v. Walker, 9 Wall. 603, 604, 19 L. Ed. 650, as follows:

"Where the court does not on its own motion order a rehearing, it will be proper for counsel to submit without argument, as has been done in the present instance, a brief written or printed petition or suggestion of the

point or points thought important. If, upon such petition or suggestion, any judge who concurred in the decision thinks proper to move for a rehearing, the motion will be considered. If not so moved, the rehearing will be denied as of course."

What are called here petitions for rehearing contain the arguments which might be expected after a rehearing had been granted. They consist largely of long citations from testimony, which, if at all material, should have been called to the attention of the court, with proper references to the record, at the trial of the cases.

The petition in behalf of the Gov. Ames relates particularly, if not entirely, to questions of costs. First, it contains a full rediscussion of a question which we fully considered and settled as to the disallowance of $393.75 paid by the Gov. Ames to a bonding company for the bond releasing the vessel. This discussion might have been very appropriate, if we had ordered a rehearing on this point.

The error which we made in referring the item of $393.75 to the wrong libel would have been at once corrected on the matter being called to our attention informally, and we have accordingly now corrected the same.

In like manner, we might well have been spared the long discussion with reference to the travel of witnesses from foreign parts, in view of the fact that we expressly left that question for revision by the District Court. The substance of all we said was that the allowances, if in dispute, must be fortified by legal proofs, inasmuch as it is easy to see that otherwise great abuse might arise therefrom, especially as such allowances are made only in this circuit.

In like manner, the petition for rehearing in behalf of the Lejok involves even further departures from the rule of Public Schools v. Walker. It contains long extracts from the record, amounting to a reargument of some of the principal points supposed to be involved, which, if submitted to us when the case was argued, might have been of some importance. So far as we have examined them, we can only say that the petition overlooks the fact that in our opinion we followed strictly the pleadings in behalf of the Lejok, and the main propositions submitted in the argument of her counsel of record, whom we were entitled to look to as master of the litigation; and they especially overlook the fact that the fundamental proposition on her behalf, as the case was submitted to us, was that the Gov. Ames was in error as to which vessel was to keep her course.

Ordered that the judgment in No. 858 is modified, by directing that the sum of $393.75 for premiums be stricken out of the costs allowed the Gov. Ames by the District Court, and that so much as relates thereto in the judgment in No. 859 be canceled.

It is further ordered that, inasmuch as on due consideration of the petitions for rehearing filed in No. 858 and No. 859 on February 28, 1911, no judge who united in the judgments desires that either case be reargued, each petition is dismissed, and in each case mandate will issue forthwith.