## THE BRAND.

### THE E. STARR JONES.

(Circuit Court of Appeals, Third Circuit. June 28, 1915.)

No. 1929.

1. COLLISION ☞93 — STEAM AND SAILING VESSELS CROSSING — OBSCURED LIGHTS.

A schooner *held* solely in fault for a collision with a crossing steamship at night in Delaware Bay for carrying her side lights in such position that the one on the side next the steamship was obscured by the sails and could not be seen from the steamship until too late to avoid the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 194, 195; Dec. Dig. ☞93.]

2. COLLISION ☞136—DAMAGES RECOVERABLE—LOSS OF TIME IN REPAIRING.

Loss through delay while making repairs is an element of the damages recoverable for collision, and where the injured vessel was under a time charter the rate of charter hire may be accepted as prima facie fixing the measure of damages.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 290; Dec. Dig. ☞136.]

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Joseph Buffington, Judge.

Suit in admiralty for collision by Herbert L. Heyliger, master of the schooner E. Starr Jones, against the steamship Brand, and cross-suit by Edward Ballestad, master of the Brand, against the schooner. Decree for cross-libelant (214 Fed. 266), and libelant appeals. Affirmed.

Howard M. Long, of Philadelphia, Pa., for appellant.

Henry R. Edmunds, of Philadelphia, Pa., for appellee.

Before McPHERSON and WOOLLEY, Circuit Judges, and THOMSON, District Judge.

THOMSON, District Judge. On October 13, 1912, about 4:30 o'clock a. m., a collision occurred in the Delaware Bay, between the American schooner E. Starr Jones, and the Norwegian steamer Brand, in which both vessels sustained considerable injury. Cross-libels were filed to recover damages, which resulted after trial in a decree sustaining the libel of the Brand and dismissing that of the E. Starr Jones. After decrees entered, the cases were consolidated and combined into one action for the purpose of appeal.

The E. Starr Jones is a four-masted sailing vessel, 185 feet long and 38 feet beam, and was on a voyage from Philadelphia to Porto Rico with a cargo of coal and carrying a crew of seven men. The Brand is a steamer 280 feet long and 37 feet beam, and was bound from Nova Scotia to Chester, Pa., on the Delaware river, with a cargo of plaster. The schooner was under tow by a steam tug until about 3:30 a. m., when the tug was cast loose and the schooner proceeded under her own sails down the bay in a southeasterly course. For a period of about two hours prior to the collision the schooner's sails were being set. The master and some of the witnesses for the schooner say that the sails were all set before the collision, while the mate testifies that they were just finishing that work, pulling the main topsail at the time of the collision. The weather was clear, with wind from the north. There was no mist or haze. The stars were shining, and, although dark, it was a good night for lights to be seen. The approaching vessels were on a wide part of the Delaware Bay. No other vessels were in the immediate vicinity, and each had ample sea room in which to maneuver. It is clear, therefore, that the collision was not the result of inevitable accident, but of fault on the part of one of the vessels.

[1] The learned trial judge exonerated the steamer, holding the schooner to be wholly at fault, and in this conclusion we concur. The finding of the learned judge fixes the cause of the collision to be in so placing the schooner's green light on the starboard side that it was screened or obscured by the sails, and was thus not visible from the approaching steamer. This finding seems to be in harmony with the facts as shown by the testimony. While the law does not regulate just where the side lights on a sailing vessel shall be placed, it does require that the starboard light shall be so located as to show from a point straight ahead to two points abaft the beam on the starboard side, and the port light shall show a similar arc of the circle on the port side. The testimony indicates with considerable certainty that the schooner's side lights were placed in the fore-rigging high above the deck—some witnesses say 14 feet above the rail, or about 18 feet above the deck and over 4 feet inside the rail. It appears that the forestaysail boom measured 29 feet forward, while the distance from the center of the mast, where the boom is, was about 13 feet. The course of the schooner being southeast, with the wind from the north or northwest,

she would have the wind on her port quarter, her booms and sails would all be well off to the starboard side, and it is claimed with much force that her green light would thus almost necessarily be obscured. This inference which could fairly be drawn from the location of the light and the position of the sails, due to the course of the vessel and the point of the wind, is borne out by the witnesses on the Brand. Assuming that these witnesses are credible, and were ordinarily careful and efficient seamen, their testimony is very convincing.

About 4:15 a. m. the steamer took on board a licensed pilot, said to be one of the most experienced on the Delaware river and Bay. Her lights were properly set and burning. On the lookout bridge was a competent seaman, while the licensed pilot, the captain, second mate, and helmsman were on the main bridge. She was running north by west at about eight knots per hour. It is not controverted that the lights on the Brand were seen and reported from the schooner. The lookouts on each vessel saw and reported the lights on a tug with barges, which was going up the bay. The officers of the schooner, relying on her lights being seen by the approaching steamer, held to her course until a collision was imminent, when her helmsman, in the exigency of the case, put her wheel hard astarboard, changing her course sharply to port. The lookout on the Brand was on the lookout bridge, which extended from side to side of the steamer. The substance of his testimony is that the first thing he saw of the schooner was her fore and top sails when she was about 150 feet away on the port side; that this was the first knowledge he had of her presence; that he had been looking, but saw no light; that, very soon after he saw her sails, he saw her green light for the first time; that she was then close to them, and that her booms were far on the starboard side. The licensed pilot says, in substance, that the first he knew of the schooner's presence was when he saw her sails about four points on the steamer's port bow; that he could see no lights; that as soon as he saw her sails he ordered the helm of the steamer to be put hard aport, which threw her head to starboard about three points, and that he saw her green light just before the collision; that her sails must have obscured her lights, or he would have seen them.

This testimony is corroborated by the second mate and the master, who were on the upper bridge with the pilot. The second mate, a seaman of 20 years' experience, was on watch at the time of the collision. He says the first he saw of the schooner was her sails when she was about 25 or 30 fathoms away; that he looked for lights, but could see none; that right after he saw her sails he made out her green light, and that it must have been obscured by her sails. The master says he first saw the schooner's sails 30 or 35 fathoms away on the steamer's port bow; that he then looked for lights, but could not see any; that as soon as they saw the sails the pilot gave orders to hard aport the helm of the steamer, and that he then went and helped the man at the wheel; that just before the collision he saw for the first time the schooner's green light, and expresses the opinion that the only way he could have missed seeing her lights was by their being obscured by the schooner's sails.

We have, then, three concurring facts, or groups of facts, which sustain the conclusion of the learned trial judge as to the cause of the collision: First, the reasonable probability of the light being screened from its location in the rigging and the position of the boom and sails, due to the course of the vessel and the direction of the wind; second, the fact that competent officers, whose position on the steamer and the conditions of navigation surrounding their vessel required the exercise of special care and vigilance, saw the sails of the near approaching schooner, but at that time saw no lights upon it; third, the fact that very shortly thereafter the green light appeared, and was seen by all of them; in connection with the admitted fact that about that time the schooner's head was swung to port, which would naturally bring her green light into range.

We therefore concur in the findings of the learned trial judge that the schooner was solely at fault, and that the cause of the collision was the screening of her light by the sails, so that it was not visible to the lookout on the Brand until too late to avoid the collision. The evidence also supports the learned judge's view that neither vessel was at fault in the steps which they severally took to avoid a collision when the same became imminent. Viewed with deliberation after the accident, the course adopted might not be approved as the best; but in emergencies men must act quickly, and the law looks with much leniency on an error of judgment committed in an honest attempt to avoid a threatened danger.

[2] A number of assignments allege error in awarding to the steamer Brand the sum of $1,212.39 as damages for detention of the vessel during 9 days and 16 hours while undergoing repairs. It is entirely clear that one of the elements of damage to which the appellee was entitled was the loss of the use of the vessel while being repaired, whatever that loss might be. It is said in The Potomac, 105 U. S. 630, 26 L. Ed. 1194:

"The rules of law governing this question are well settled, and the only difficulty is in applying them to the peculiar facts of the case. In order to make full compensation and indemnity for what has been lost by the collision, restitutio in integrum, the owners of the injured vessel are entitled to recover for the loss of her use while laid up for repairs. When there is a market price for such use, that price is the test of the sum to be recovered. When there is no market price, evidence of the profits that she would have earned, if not disabled, is competent; but from the gross freight must be deducted so much as would in ordinary cases be disbursed on account of her expenses in earning it. In no event can more than the net profits be recovered by way of damages."

What was the loss of the use of the vessel? The vessel at the time of the collision was under charter to the Keystone Plaster Company. The charter hire for 9 days and 16 hours, under the monthly rate stipulated in the charter, was $1,212.39, which amount the charterers deducted in the settlement with the owners. No other evidence was offered by either side on the question of damages. Conceding that, when there is a market price for the use of the vessel, that price is the test in the first instance of the sum to be recovered, is not the stipulated rate of damage in the vessel's charter at least prima facie evidence of the

loss occasioned by the detention? It was so held by the Circuit Court in Orhanovich v. The America, 4 Fed. 337. In the case of The Columbia, 109 Fed. 661, 48 C. C. A. 596, the court said:

"Taking the facts of this case into consideration, we are of opinion that the evidence as to the provisions of the charter party was competent to be admitted. Conceding that it may not be conclusive in all cases, it nevertheless makes out a prima facie case, which, in the absence of any proof to the contrary, justifies the rendition of a decree in accordance therewith. The court did not err in allowing the damages."

In The Governor Ames, 187 Fed. 40, 109 C. C. A. 94, the appellate court held that where a vessel was injured in a collision for which the other vessel was in fault, and her detention was not such as to require the discharge of her crew, or prevent her from completing her voyage, the rule is settled that the agreed damage under her charter may properly be accepted as fixing prima facie the amount of her damages for the detention. This case quotes approvingly from the opinion of Judge Butler in the case of The Rebecca v. The America, Fed. Cas. No. 11,-619a, on the question of damages, where that judge said:

"This rule has been pronounced, by those having the largest experience and the highest intelligence on the subject, the safest thing under general circumstances that can be pursued."

Other authorities might be cited to the same effect.

The assignments of error are overruled, and the decree is affirmed.