## THE TEXAS.

## THE JAMES McCAULLEY.

(Circuit Court of Appeals, Third Circuit. October 4, 1915.)

No. 1859.

1. COLLISION ⚖102—STEAMSHIP AND TOW MEETING—FOG.
     A collision on the Delaware river in a fog, between an outgoing steam-ship and a meeting schooner in tow of a tug on a 60-fathom line, held, on conflicting evidence, due to faults on the part of both the steamship and tug; the former being in fault for not hearing the fog signals of the tug, which she should have heard, and taking earlier precautions to avoid the tow, and the tug being in fault for being on a course taking her across to the western side of the river, where she had no right under the rules, and which course was especially dangerous in a fog and with her long tow.
     [Ed. Note.—For other cases, see Collision, Dec. Dig. ⚖102.
     Collision with or between towing vessels and vessels in tow, see note to The John English, 100 C. C. A. 581.]

2. ADMIRALTY ⚖124—TAXABLE COSTS—EXPENSE OF SURETY COMPANY BOND.
     There is no statute authorizing the taxing of the expense of procur-ing a surety company bond for the release of a vessel libeled for col-lision as costs, and in the absence of a rule of court or a practice equiva-lent thereto such expense is not taxable.
     [Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 836–857; Dec. Dig. ⚖124.]

Appeal from the District Court of the United States for the District of Delaware; Edward G. Bradford, Judge.

Suit in admiralty for collision by Walter M. Ervin, master of the schooner Dorothy B. Barrett, against the steamship Texas, with the tug James McCaulley, impleaded. Decree against both vessels, and their claimants appeal. Affirmed.

For opinion below, see 207 Fed. 669.

Lewis, Adler & Laws, of Philadelphia, Pa., for the James McCaulley.

H. Alan Dawson, of Philadelphia, Pa. (Biddle, Paul & Jayne, of Phil-adelphia, Pa., of counsel), for the Texas.

Andrew C. Gray, of Wilmington, Del., for the Dorothy B. Barrett.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

McPHERSON, Circuit Judge. This suit has to do with a collision on the Delaware river, and at first was between the schooner Dorothy B. Barrett as libelant and the steamship Texas as respondent. The col-lision occurred on December 20, 1906, in the daytime, a few minutes after 2 o'clock, but a fog was prevailing and this condition no doubt occasioned the disaster. The schooner was in tow of the tug James McCaulley, and the Texas afterwards brought in the tug under the fifty-ninth rule (29 Sup. Ct. xlvi). Essentially the whole controversy is between the two steam vessels, for neither contends seriously that the schooner was at fault, and in any event we agree with Judge Brad-

ford (whose opinion is reported in 207 Fed. at page 669), that "the evidence does not disclose actionable or substantial negligence on the part of the Barrett." We shall therefore confine our attention to the conduct of the other two vessels: both have been found in fault, and each has appealed. As happens too often in the admiralty—even after allowance is made for the obstacles in securing evidence abroad and from seafaring people anywhere—the parties have maintained a leisurely pace in bringing this dispute to a final decision. We do not attempt to apportion the responsibility for this delay; we speak of it merely in order to point out in passing that the criticisms often heard about the tardy foot of the law, justified as they seem to be by such an example as this, should in fairness be directed in many, perhaps in most, instances, not against procrastination by the courts, but against undue deliberateness by the parties themselves.

We have attentively read and considered the 700 pages of this record, and desire to record our obligation to counsel for the excellent and vigorous discussion contained in their briefs. Our conclusion that both vessels were in fault does not differ from the conclusion below; but it may perhaps be desirable to find the facts more fully, and to state independently the reasons that support the decree.

[1] 1. The Texas is a Danish steamship in the transatlantic trade, 375 feet long and 50 feet beam, and was descending the Delaware river from Philadelphia, loaded and drawing something over 21 feet. She was in charge of a licensed pilot, a man of 35 years' continuous experience on the river and bay, and with him on the bridge were the master and a man at the wheel. A lookout was on the forecastle head, where the mate and the carpenter were also engaged for much of the time. The second mate was on duty aft, and in the engine room three engineers were also on duty. Several seamen were about the decks, and the steward was in the galley on the main deck. The Barrett is a five-masted schooner, 275 feet long and 45 feet beam. Being empty, she was drawing only about 11 or 12 feet. Her master, her first and second mates, a helmsman, and a lookout were on duty, while other seamen and a passenger were about the deck. She was bound up the river to the port of Philadelphia. The steam tug McCaulley is 82½ feet long, 19½ feet beam, and was drawing about 9½ feet. Her mate was at the wheel, her master was on lookout and was also blowing the signals, her second engineer was on duty in the engine room, where the chief engineer was also present, and the other members of the crew were inside, some at work and some asleep. The tug was towing the schooner on a hawser at least 60 fathoms in length. The tide was toward the end of flood and was running up about two miles an hour; a light and unimportant wind was blowing from the northeast; and when the collision happened, as well as for some time before, a fog of varying density prevailed, sometimes and at some places permitting vessels and other objects to be seen as far away as 800 or 1,000 feet. It was thinner toward the north and west of the place of collision than toward the south and east. From about 12 o'clock, fog and fair weather had alternated; but the vessels had proceeded in safety, although the conditions were such that both the tug and the steamship were seriously consider-.

ing the advisability of anchoring until the fog should disperse. There is no anchorage ground in that neighborhood along the western or Pennsylvania side of the channel; the established ground being "eastward of the channel marked by the Schooner Ledge range lights, opposite to and above the oil wharves at Marcus Hook." The place of collision was along the Schooner Ledge range, above Marcus Hook, and not far below the city of Chester; but the distance from the Pennsylvania shore is a matter of dispute, and will be referred to again in a few moments. The principal contention of the steamship is that the tug had already gone over to the eastward at Marcus Hook, intending to anchor the schooner, but had abandoned the intention, because she heard the steamship's fog whistles before she could carry it out, and had thereupon started back across the channel to the westward (although this was the wrong side), desiring to run up in sight of the land, and was in the act of crossing when the steam vessels caught sight of each other out of the fog.

In more detail the account of the Texas is as follows: She came steadily down the Schooner Ledge range, about in the center of the channel, practically parallel with the Pennsylvania shore, which was more or less visible at times 1,000 feet away on her starboard side. About 20 minutes before the collision, as she approached a drill that was anchored and working on the rocks of Schooner Ledge at the eastern edge of the channel, the light fog grew thicker, and she reduced her speed to dead slow. Shortly afterwards, as the fog showed no sign of dispersing, she decided to anchor on the established ground eastward of the channel as soon as she should reach a point far enough below the drill to avoid danger to that vessel from the steamship's swing up-river on the flood. This was the only anchorage available; not only was it the established ground, but of course the channel itself could not be obstructed, and there was no anchorage on the westward, both because of danger from rocks and because there would be no room to swing. While the Texas was still above the drill, she began to sound the regular fog signal of one prolonged blast at intervals not exceeding one minute, and continued to sound it until the tug gave her a passing signal of two blasts as hereafter stated. The tug had heard the steamship's fog whistle several times, the first being about 15 or 20 minutes before the collision, when the sound seemed to be about a mile away; and the master of the schooner had also heard the signal at least once. But the steamship asserts that she did not hear a fog signal from the tug at any time, and this point (which is important) will also be referred to again. Having decided to anchor, the pilot stopped the engines of the Texas as she reached the drill, or very soon afterwards, and changed the course a half point to southwest by west, altering both speed and course so as to reduce headway and bring the vessel over gradually to a proper position. She passed westward of the drill about 2 o'clock, only a few minutes before the collision, and her compass course was then observed to be S. W. by W. after allowing a half point for deviation. Very soon afterward she passed about the same distance eastward of the Illinois Rock buoy, which marks the opposite or western edge of the channel, and is not far below the ledge on which the drill

was working. Several witnesses from the Texas observed that the line of the Pennsylvania shore, approximately 1,000 feet to starboard, was practically parallel with her course; and some of them observed, also, that another vessel was passing down to starboard so much more rapidly that she soon disappeared in the fog. It is contended, therefore, that almost immediately after the steamship passed the drill her course of S. W. by W., and her position at or very near the center of the deep-water channel (which was only 500 or 600 feet wide), are definitely fixed by the compass, by the position of the drill and of the Illinois Rock buoy, by the shore line, and by the course of the other vessel that was passing down. Thereafter, and during the few minutes before the collision, she did not change her course to the westward. Her speed at this time was not more than enough for steerage way, perhaps from 1 to 1½ miles an hour over the ground, or from 3 to 3½ miles through the water, and this was being reduced gradually, since her engines were stopped and the tide was against her. While she was thus feeling her way eastward, so as to anchor below the drill, she heard a passing signal of two blasts in the fog ahead, and almost at once saw the tug about 800 to 1,000 feet ahead, slightly on the port bow, and crossing the channel toward the western shore at an angle of about 45 degrees. This signal from the tug gave the Texas her first knowledge that the tug was on the river at all, and even then the fact that she was also towing was not known, for she had not given the fog signals required by the rules. As soon, however, as the tug was seen—which was very soon after she gave the passing signal—the steamship answered with two blasts, accepting the proposal to pass starboard to starboard, and promptly put her helm hard-astarboard, in order to get over to the eastward and give the tug all the room available. But the Texas was heavily loaded, she had very little water under her bottom, and besides was moving slowly for the other reasons just stated. Necessarily, therefore, she could not swing rapidly to port, but she did swing to some extent—farther indeed than was necessary to clear the tug, for the latter vessel crossed by an ample margin of safety, and was some distance to the westward before the collision.

This brings the account to the point where the schooner appears. The Texas continues: A minute or two after the tug was seen the schooner loomed up for the first time. She was on the port bow, in the thicker fog to the eastward, and may have been distant about 600 feet, and was evidently following the tug's course across the steamship's bow. At this time the speed of the tow was about 3 miles through the water, or from 4 to 5 miles over the ground, without allowing for the schooner's leeway caused by the tide, while the steamship's speed was not more than a mile an hour over the ground. The tug was already safely across, but as soon as the schooner appeared the Texas saw the danger of collision unless she could get out of the road more quickly; for the reasons given, she was answering her hard-astarboard helm very slowly. Accordingly, the engines were ordered slow ahead, but this order was changed instantly to full speed astern. These orders were given in quick succession by the master without removing his hand from the telegraph, and if the engines moved forward at all they

moved only for a moment and did not increase the speed in the least. They ran full speed astern until the collision took place about two minutes later, and this maneuver was accompanied by the required signal of three short blasts of the whistle. The Texas has a right-hand propeller, and for this reason her engines when running full speed astern inevitably make her helm useless, and tend to pull her stern to port and throw her bow to starboard. For this reason, as soon as she was observed to be tending in the latter direction, the starboard anchor was let go to hold her steady. This object was accomplished; indeed, she was nearly at rest when the anchor was dropped, for she only ran over the chain a few feet at most, and at the moment of collision had started to drift slowly up river on the tide. When the anchor was let go, the distance between the vessels was probably about 200 feet. While the steamship was executing these maneuvers the schooner was coming on with a slightly changed heading to westward, or nearly broadside to the channel, and her starboard side, a little forward of amidships, struck the bow of the Texas at an angle of 5 or 6 points. The blow did not stop the schooner, or alter the heading of either vessel. The tug was still pulling, indeed had increased her speed, and the schooner continued to scrape or bump her starboard side across the bow of the steamship until the schooner's bottom was arrested by the taut chain of the dropped anchor, and both vessels were thus held together for 10 or 15 minutes. Meanwhile the tug, whose hawser had slipped off the bitts, came back, got a line again on the schooner, and finally towed her clear. While the two vessels were lying together they remained in about the same angle as at the moment of collision, the bow of the Texas pointing somewhat toward the stern of the schooner and the starboard side of the Texas being nearer the schooner's starboard side. Both vessels were kept from drifting up the river on the tide by the anchor chain of the steamship. None of the three vessels was aground at any time. The schooner was injured, but the steamship suffered no damage, and afterwards continued her voyage. The cost of repairing the schooner appears to have been about $5,400, and this is practically all the evidence concerning the nature or extent of her wound.

The Texas charges the tug with fault in continuing to tow the schooner in such a fog through a narrow channel, insisting that she should have carried out her intention to anchor on the established anchorage ground eastward of the channel at Marcus Hook. At all events, whether she ought to have anchored or not, she is especially charged with fault in trying to cross the channel again to the Pennsylvania shore, with a large schooner in tow on so long a hawser, particularly when she heard the fog whistles of the Texas coming down the channel. Repeating the allegation that everything possible was done by the Texas to avoid the disaster—sounding correct and timely fog signals, proceeding dead slow on a proper course, executing the right maneuvers as soon as the tug came in sight—the steamship declares the fault for the collision to be due primarily, if not solely, to the tug's negligence in crossing a narrow channel with a large, light-draft, schooner in tow on a long hawser, under the prevailing conditions of fog, without sounding fog signals, and with knowledge that a steam-

ship was coming down the channel. Other contributing faults of less importance are charged, but the vital element of the steamship's case is the position of the tow in the channel; the danger thus caused being greatly increased by failure to give the fog signals required by the rules.

Thus far, the steamship. The tug's account of the collision is as follows: She took hold of the schooner not far from the Delaware Capes, the hawser being then about 100 fathoms long. At Ft. Delaware she shortened it to 50 or 60 fathoms, and when the weather became foggy at Grubb's Landing, more than a mile below Marcus Hook, she slowed her engines from full speed to 2 or 3 miles an hour, at the same time beginning to blow the fog signal prescribed for a steam vessel with a tow; namely, one long and two short blasts at intervals of one minute, and continued to blow the proper signal until shortly before the collision took place. She passed Marcus Hook in safety, on a course parallel with the western or Pennsylvania shore and close thereto; this course (which is on the port side of the channel) being also parallel with the Schooner Ledge range, but well over to the westward. The shore was plainly visible from time to time; the fog being so thick to the eastward as so shut out the eastern or New Jersey shore altogether. The movements of the tug were directed by her master, who has held a master's license for 25 years, and had been in command of the tug for 19 years. He was just outside the pilot house, and the first mate (also a licensed navigator for many years) was at the wheel within. After the tug passed Marcus Hook, she heard the fog whistle of the Texas on her starboard bow, and proceeded slowly and cautiously, continuing to blow the required fog signal and keeping close to the Pennsylvania shore, then visible to the westward, thus giving the steamship the whole width of the channel. She heard the fog signal of the Texas three or four times, always on the starboard bow, and lessened her speed to dead slow, keeping steerage way only. While thus proceeding, she caught sight of the Texas about 1,000 feet away, broad off the starboard bow, at an angle of 4 to 6 points, but heading toward the tug. At once she blew a passing signal of two blasts, and the Texas promptly accepted the signal; both vessels thus agreeing to pass starboard to starboard. The tug changed her course to port, so as to bring her still closer to the western side of the river, and the schooner also put her wheel to starboard, so as to follow the tug. But the Texas disobeyed the agreement and kept swinging to the westward toward the tug and the schooner. The tug thereupon repeated the two-blast signal (which was again promptly accepted), and put her wheel hard-astarboard, ordering the schooner to do the same. The tug passed by an ample margin, and in the hope of saving the schooner put her engines full speed ahead; but the Texas, maintaining an improper speed of 7 or 8 miles an hour, kept on toward the schooner until she came as near as 100 or 200 feet. At that point she let go her starboard anchor, but this did not check her headway or prevent her from continuing to swing to the westward; still coming on, she surged over the anchor chain, struck the schooner a severe blow on the starboard side between the main and mizzen masts, rebounded, and struck her again about 20 feet farther aft, and then

scraped or bumped along her starboard side. The blow pulled the hawser from the tug's bitts, and pushed the schooner's bow around to starboard, until she became fast on the chain of the dropped anchor. The tug then went back and pulled the schooner clear.

The place of collision was south of Chester about 400 feet below an old oil wharf at the suburb of Thurlow. The channel is 24 feet deep in its narrowest part (where it is 600 feet wide) and widens and deepens as it approaches Marcus Hook, so that near the oil wharf referred to it is 30 feet deep for about 1,300 feet. High water would add about 6 feet to the depth. Eastward of Marcus Hook is the established anchorage ground already described. Drawing not more than 12 feet, and therefore able to proceed close to the western edge of the channel, the tug and schooner passed the anchorage ground with a wide margin, thus giving ample room and ample depth of water to vessels bound down or intending to anchor. As the Texas was intending to anchor, preparations therefor were being made by her first mate, the carpenter, and even by her lookout, who was thus diverted from his duty. As she passed the drill, the Texas had already shaped her course to the eastward of the range toward the anchorage ground, and therefore, when she heard and accepted the passing signal, she could have gone eastward of the range far enough to pass both the other vessels in complete safety; but she had not heard the fog signals of the tug (although she should have heard them), and therefore did not know that the latter was towing. Seeing the tug pass, the Texas supposed the danger was over, and then was suddenly confronted by the schooner. She should have changed her course at once to the eastward, but instead of doing so she reversed and went full speed astern. But her speed and headway were so great that she rapidly closed up the interval (800 or 1,000 feet) between her and the schooner, and as the reversing engines inevitably threw her bow to starboard she swung around nearly at right angles to the schooner, and a collision was evidently impending. Thereupon, to stop her swing to starboard, she dropped her anchor, but without success. She surged forward over the chain, and struck the schooner in the manner already described. Her momentum in connection with her swing to westward, caused by reversing, carried her diagonally across the channel, and made the collision certain. The District Judge is criticized for saying that he does not place "any reliance upon the reckless testimony, adduced on the part of the Barrett and the tug, that the Texas ported her helm, swung to starboard, and headed toward the Pennsylvania shore almost at right angles, maintaining a speed of from 6 to 10 knots through the water and thus causing the collision." On this subject the contention of the tug is that (however the fact is to be explained) it remains true that the steamship did change her course diagonally to the westward; and the argument is made that the change was probably due to the reversing of the engines, coupled with the fact that the steamship was coming down the river too fast at the time when she suddenly discovered the schooner ahead of her. The tug insists that the collision occurred on the westward side of the river a short distance from the shore—an effort being made to justify her position on the port side of the channel—and, if this be true, she contends that the disaster must

have happened in accordance with the theory just outlined. But, if the collision occurred eastward of the center line of the channel, as the Texas contends, then the tug asserts that she was not on the wrong side, and has not been shown to be in fault.

Each of these opposing theories is supported by a good deal of evidence, and we find it impossible to reconcile the conflict. In this class of cases the proof of physical facts (for example, the position of a sunken vessel) sometimes enables a court to pronounce with certainty at what point on the water the collision took place; but in the present controversy the evidence on this subject is nearly all of one grade—the clashing assertions of the witnesses that the collision occurred at one point or the other. So, too, the injured condition of the vessels is sometimes of great value in determining the force and direction of the blow; but here we have almost nothing to guide us except the slipping of the hawser from the bitts, and the stipulation of the parties that the cost of repair was about $5,400. Being obliged, therefore, to solve the problem by adopting the more probable account, we find as a fact that the place of collision was not close to the Pennsylvania shore, but was more nearly in the center of the channel. We think it not unlikely that the tug had gone over toward the regular ground with some intention of anchoring, but had changed her mind. However this may be, and assuming that in the first instance she may have been coming up close to the center of the channel, or even over on the proper side, we believe the fact to be that she was crossing the channel toward the westward, intending, as indeed she herself says, to keep in sight of the land and to go up on that side of the river. This was a fault. There was no compelling reason to take her there, and her own convenience could not be a sufficient excuse under all the circumstances. She may have been at liberty to continue running in the fog, but she was the more bound to conform to the rules and keep on the proper side of the channel. To go in the wrong direction in a fog, stringing out a tow as long as this across a narrow channel (whatever the length of the hawser may have been) was likely to end in disaster, and in this case her conduct was such a distinctly contributing fault of such importance that we need not look for any other to justify the decree against her.

In many particulars the Texas seems to have executed the proper maneuvers, especially after she caught sight of the tug and after the passing signals were exchanged. But in one important respect we find her also in fault. Of course, while the fog was obstructing the view, she could not know by sight that the tug was there at all, or (if there) was engaged in towing; but she was the more bound to great vigilance in the use of the only other sense at her command, and she was bound to take note of the tug's fog signals, if they were given and could be heard. She insists that she did not hear them, and asserts in effect that they were not given at all; but in this matter we think the probabilities are against her. We accept it as a fact that the tug did blow the fog signals regularly, and that they could have been heard for a considerable time before the two steam vessels emerged. The Texas is therefore at fault in failing to hear these signals, and nothing more is needed to charge her with a contributing share in the

collision. If she had heard them when she should, she would have had earlier knowledge that a tow was approaching, and could (and no doubt would) have taken earlier precautions in reducing speed and in such other maneuvers as the exigencies of the situation would then have required.

We think, therefore, that each vessel was in fault and has properly been charged with one-half of the damage done to the schooner.

[2] 2. The next question is whether the District Court was correct in refusing to tax as part of the costs the premiums that were paid for the entry of corporate security. The precise point is not whether, in our opinion, modern conditions have made it desirable that such premiums should be taxed as costs, but whether any statute, or any rule or equivalent custom in the district of Delaware, required or justified the taxation. The clerk rejected the items on the following ground:

"I do not know of any statute that makes such items taxable as disbursements or otherwise, and there is no rule of court or established practice in this district permitting a recovery of such items. I am aware of no decision of the Circuit Court of Appeals for the Third Circuit or of the District Court for this District on this subject."

And the District Court affirmed the clerk's decision.

In our opinion the clerk was right in saying that no statute makes such an item taxable. The subject has been sufficiently discussed in the following cases: The South Portland (D. C.) 95 Fed. 295; The Willowdene (D. C.) 97 Fed. 509; Lee Injector Co. v. Penberthy Co. (C. C. A. 6th Cir.) 109 Fed. 964, 48 C. C. A. 760; Jacobsen v. Klondike Co. (C. C. A. 9th Cir.) 112 Fed. 73, 50 C. C. A. 121; The Robert Dollar (D. C.) 116 Fed. 79; Edison v. Mutoscope Co. (C. C.) 117 Fed. 192; The Bencliff (D. C.) 158 Fed. 377; The John Dailey (D. C.) 158 Fed. 643; The Hurstdale (D. C.) 171 Fed. 607; The Volund (C. C. A. 2d Cir.) 181 Fed. 643–667, 104 C. C. A. 373; Jones v. Smith Co. (C. C.) 183 Fed. 990; The Governor Ames (C. C. A. 1st Cir.) 187 Fed. 40, 109 C. C. A. 94; The Europe (C. C. A. 9th Cir.) 190 Fed. 481, 111 C. C. A. 307; The Governor Ames (D. C.) 199 Fed. 587. And we shall only add our approval of the argument that a rule of court, or a practice equivalent thereto, is needed to justify the taxation. But we may also say that we think such a rule or practice has become so desirable that we feel confident the court below will take an early opportunity to conform its procedure in this respect to the custom prevailing in other districts.

3. As the only real dispute in this case was between the tug and the steamship, we see no reason to interfere with the discretion of the District Court in requiring each party to pay one-half the total costs.

On each appeal the decree is affirmed.